**James Edward LEMING, Appellant**

**v.**

**The STATE of Texas**

**NO. PD–0072–15**

Court of Criminal Appeals of Texas.

DELIVERED April 13, 2016

Rehearing Denied July 27, 2016

Clement Dunn, Longview, TX, for Appellant.

Lisa McMinn, State Prosecuting Attorney, Austin, TX, for the State.

## OPINION

Yeary, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, III, and IV in which Keller, P.J., and Meyers, Alcala and Richardson, JJ., joined, and an opinion with respect to Part II in which Keller, P.J., and Meyers and Richardson, JJ., joined.

Appellant pled guilty to, and was convicted of, the offense of driving while intoxicated, a felony in this instance because he had two prior DWI convictions. TEX. PENAL CODE § 49.09(b)(2). The trial court assessed his punishment at ten years' incarceration in the penitentiary. Prior to his plea, Appellant filed a motion to suppress the product of the traffic stop by which the offense was discovered. The trial court denied his motion to suppress, and Appellant challenged that ruling in a single point of error on appeal.

The Sixth Court of Appeals reversed the trial court's ruling, holding that the trial court should have granted the motion to suppress. *Leming v. State*, 454 S.W.3d 78 (Tex.App.–Texarkana 2014). The court of appeals concluded that, on the particular

facts of this case: 1) the arresting officer lacked even a reasonable suspicion to detain Appellant for the offense of failure to maintain a single lane, under Section 545.060(a) of the Texas Transportation Code; and 2) the stop was not a legitimate exercise of the arresting officer's community care-taking function. *Id.* at 84, 86. We granted the State Prosecuting Attorney's (SPA) petition for discretionary review, and we now reverse the judgment of the court of appeals.

## I. BACKGROUND

### In the Trial Court

Manfred Gilow, the only witness at the hearing on Appellant's motion to suppress, was on duty as a Longview police officer on the afternoon of January 20, 2012. At around 2:00 p.m., his dispatcher notified him of a citizen's report of a vehicle on the road that was "swerving from side to side." Gilow was informed that the reporting party's name was "Arliss," and that Arliss had described the swerving vehicle as "[a]n older-style white Jeep." Gilow passed Arliss, who was following the Jeep in a Honda, and, as the recording made from Gilow's dash cam shows, having "advised the reporting party to back off," Gilow pulled in behind the Jeep. Gilow followed the Jeep for several minutes over several miles. During that time he observed on radar that the Jeep was traveling thirteen miles per hour below the posted speed limit and that the driver "slowed down more and more." Gilow saw that the Jeep "was drifting in its lane to the left, to the center stripe to the—to the left lane; tires were on the stripes. Went back to the right several times, almost hit the curbs twice—the curb."

The dash cam video bears out Gilow's account. Beginning at 2:07:11 p.m., it shows Gilow approaching behind Arliss's Honda, which is in the right hand lane of a relatively straight, four-lane divided roadway, with two lanes moving in each direction and curbs rather than shoulders. The Honda is following a white Jeep at a safe distance, and it can be seen to brake as Gilow's patrol car passes it in the left hand lane and then pulls in behind the Jeep in the right hand lane. The Jeep immediately swerves to the left (2:07:28), starting from a position fairly close to the curb and cutting all the way over to the broken white stripes that divide the lanes, and at least touching them. Within ten seconds (2:07:38), the Jeep has veered back to the right side of its lane, uncomfortably close to the curb; then (2:07:45) it returned to the broken white stripes, again at least touching them. Another seven seconds later (2:07:52), the Jeep has drifted back to the right, but not as close to the curb this time. Six seconds after that (2:07:58), the Jeep has migrated back toward the broken white stripes, but this time it does not touch them. For the ensuing several minutes—including a thirty second interval during which it sits idly at a stop light in front of the patrol car (2:08:30 to 2:09:00)—the Jeep does not weave as noticeably, although it does come precariously close to the curb at least twice more. Gilow eventually pulls it over into a parking lot (2:10:55).

As the video confirms, Gilow did not stop the Jeep immediately, opting instead, because of "the heavy traffic[,]" to wait until they got "to the 3000 block, because I know there's parking lots where he could pull over." To stop the Jeep sooner, in his estimation, "would have caused danger to others, so I waited a little bit to get to a better stop." Gilow justified his stop of the Jeep in terms of his community care-taking function. Asked what his "role as a police officer [was] at this point[,]" he explained:

That the driver was somehow impaired, a medical issue, a lot of stops, this—welfare check stops, they have medical issues that—diabetic shock, they just don't know when they're—still driving, functioning, but they really don't—don't know. Due to the fact that it was way below speed, the swerving in its lane itself, right, left, almost hitting the curbs twice, it was an indication that the driver is somehow either distracted or physically not able to operate this motor vehicle correctly.

When Appellant exited the Jeep, Gilow detected "a mixed odor, like cigarettes and old liquor." Appellant denied that he had been drinking, but he admitted "that he took some clonazepam and hydrocodone." After administering field sobriety tests, Gilow arrested Appellant for driving while intoxicated.

After Gilow's testimony, the prosecutor argued that Appellant's stop was indeed justified "to check on this guy and make sure that he's either okay or not okay to be on the road." Without addressing this justification, counsel for Appellant argued that "case law is clear that slight maneuvering within a lane, which is really all they have here, is not the basis for a traffic stop under the guise of either reasonable suspicion or probable cause, especially in the absence of any articulate traffic violation." He recommended that the trial court review the Sixth Court of Appeals's opinion in *Bass v. State*, 64 S.W.3d 646 (Tex.App.–Texarkana 2001, pet. ref'd), holding that "a violation of Section 545.060(a) [of the Texas Transportation Code] occurs only when a vehicle fails to stay within its lane and that movement is

not safe or is not made safely." *Id.* at 650; Tex. Transp. Code § 545.060(a).

Taking the case under advisement, the trial court eventually made the following written "findings and ruling:"

1) The video ... clearly shows the Defendant's vehicle cross the center stripe and move partially into another lane of traffic. This is a violation of the law.

2) In addition, the officer had received information from a named informant that the Defendant's vehicle was driving erratically. Based upon a totality of the circumstances, the officer was justified in stopping the vehicle.

3) The Defendant's Motion to Suppress is denied.

Appellant pled guilty and appealed the trial court's ruling on his motion to suppress.

### On Appeal

In reversing the trial judge's ruling, the court of appeals first took issue with his finding of fact that the video demonstrates that the Jeep clearly crossed the broken white stripes separating the lanes of traffic.[1] But even taking that finding of fact as supported by the record, the court of appeals rejected the trial court's conclusion that crossing into an adjacent lane of traffic is enough to constitute a violation of the provision the trial court must have relied upon (having promised the parties that he would review the *Bass* opinion), namely, Section 545.060(a) of the Transportation Code. *Leming,* 454 S.W.3d at 83. "In order for it to have been unlawful," the

---

1. "As we have said, we have reviewed the video-recorded exhibit and cannot say definitively that [Appellant's] truck crossed into the next lane." *Leming,* 454 S.W.3d at 82–83. In any event, the video positively refutes the trial court's finding that the Jeep crossed the

center stripe—that is, the stripe that divided the lanes of traffic moving in opposite directions. If anything, Appellant may have veered into the inner lane that was moving in the same direction.

court of appeals concluded, "the encroachment must have been made unsafely. On each of the two instances [in which] one could judge that [Appellant] encroached on the line dividing the lanes, there was no real danger of his colliding with another vehicle in the adjacent lane." *Id.* The fact that Gilow was acting on information provided by a named informant in addition to his own observations did not change the calculus for the court of appeals since, even treating "Arliss" as a reliable informant (a proposition the court of appeals found dubious), he did not supply any additional information from which it could be inferred that Appellant's "swerving" was unsafe. *Id.* at 83–84. Moreover, the court of appeals concluded, Gilow's asserted justification for stopping Appellant was not a reasonable exercise of his community caretaking function. *Id.* at 86.

### On Discretionary Review

The SPA does not now take issue with the court of appeals's conclusion with respect to Gilow's community care-taking function, and that issue is not before us. Instead, the SPA argues that the court of appeals erred in its construction of Section 545.060(a) of the Transportation Code. As the SPA reads the statute, the failure to maintain a single lane of traffic need not be "unsafe" to constitute an offense. Moreover, the SPA maintains, the court of appeals gave short shrift to the significance of Arliss's information in determining whether a traffic code violation occurred. Finally, and in any event, the SPA argues that the information that Arliss provided, taken together with Gilow's own observations of the Jeep, was sufficient to supply at least a reasonable suspicion that its operator was driving while intoxicated, and the court of appeals should have upheld the stop on that basis (though this argument was not made there).

### II. FAILURE TO MAINTAIN A SINGLE LANE

As enacted in 1947, the predecessor to current Section 545.060, Section (a), of the Transportation Code read:

> Sec. 60. Whenever any roadway has been divided into two (2) or more clearly marked lanes for traffic the following rules in addition to all others consistent herewith shall apply:
>
> (a) The driver of a vehicle shall drive as nearly as practical entirely within a single lane and shall not be moved from one such lane until the driver has first ascertained that such a movement can be made with safety.

TEX. REV. CIV. STAT. Article 6701d, § 60(a); Acts1947, 50th Leg., ch. 421, § 60, p. 978 ("Uniform Act Regulating Traffic on Highways"). Codified in the Transportation Code in 1995, this provision was broken down into two subsections:

> (a) An operator on a roadway divided into two or more clearly marked lanes for traffic:
>
> (1) shall drive as nearly as practical entirely within a single lane; and
>
> (2) may not move from the lane unless that movement can be made safely.

TEX. TRANPS. CODE § 545.060. Violation of these provisions was made a misdemeanor offense in the 1947 legislation,[2] and it remains so under the Transportation Code.[3]

---

**2.** *See* Acts1947, 50th Leg., ch. 421, § 22, p. 970 ("It is unlawful and unless otherwise declared in this Act with respect to particular offenses, it is a misdemeanor for any person to do any act forbidden or fail to perform any act required in this Act.").

**3.** *See* TEX. TRANSP. CODE § 542.301("(a) A person commits an offense if the person per-

This Court has yet to construe this statutory language.

In 1993, the Fourteenth Court of Appeals in Houston was called upon to enumerate the elements of the 1947 version of the offense in the context of resolving a double jeopardy claim, in *Atkinson v. State*, 848 S.W.2d 813 (Tex.App.–Houston [14th Dist.] 1993, no pet.). It said:

> The elements of failure to drive in a single marked lane are: (1) a person (2) drives or operates (3) a motor vehicle (4) *within a single marked lane,* and (5) moves from that lane without first ascertaining that such movement can be made with safety. Tex.Rev.Civ.Stat.Ann. art. 6701d § 60(a) (Vernon 1977).

*Id.* at 815 (emphasis added).There is a problem with this assessment of the statutory elements, however. It seems to discount the requirement that an operator "drive as nearly as practical entirely within a single lane[.]" It essentially removes what is now Section (a)(1), requiring a driver to stay within his dedicated lane of traffic as much as it is "practical" to do so, entirely from the statute. It makes it an offense only to ignore the prohibition against *changing* lanes when the conditions for changing lanes are not safe. But this is contrary to the actual penal provision of the Transportation Code, by which it constitutes an offense *either* to fail to perform an act that is required ("shall drive as nearly as practical entirely within a single lane") *or* to perform an act that is prohibited ("shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety").[4] We think the *Atkinson* court failed to acknowledge the "failure to perform a required act" element of Section 545.060's predecessor.

The critical question remains: Must the driver *both* fail to perform the act required by the statute (maintain a single lane as far as is practical) *and* perform the act prohibited in the statute (do not change lanes without checking to assure the maneuver can be accomplished safely) before it may be said that he has committed an offense? The first court of appeals to address this question was the Third Court of Appeals in Austin, in 1998, and it answered the question "yes." *Hernandez v. State*, 983 S.W.2d 867 (Tex.App.–Austin 1998, pet. ref'd).[5] All of the courts of appeals that have addressed the question since—about half of them—have adopted the Third Court's conclusion, without seriously questioning that court's reasoning.[6]

forms an act prohibited or fails to perform an act required by this subtitle. (b) Except as otherwise provided, an offense under this subtitle is a misdemeanor.").

4. *See* notes 2 and 3, *ante.*

5. In *Gajewski v. State*, 944 S.W.2d 450, 452 (Tex.App.–Houston [14th Dist.] 1997, no pet.), the appellant "contend[ed] that there is no evidence that his driving behavior affected the safety of any other motorists, and as such, his weaving did not violate any traffic law." The court of appeals avoided this issue, deciding instead that the appellant's weaving across the lanes of traffic gave rise to a reasonable suspicion that he was driving while intoxicated. *Id.* at 453. Also prior to *Hernandez* was *State v. Tarvin*, 972 S.W.2d 910 (Tex.App.– Waco 1998, pet. ref'd), in which the State argued that the appellant's conduct in driving over the solid white stripe on the side of the road violated Section 545.060(a). The Waco court of appeals simply concluded that "[t]he evidence does not support a finding that [the detaining officer] had a reasonable belief that Tarvin violated this provision of the Transportation Code." *Id.* at 912. It did not explain in what respect the evidence was deficient.

6. *State v. Arriaga,* 5 S.W.3d 804, 806–07 (Tex. App.–San Antonio 1999, pet. ref'd); *Ehrhart v. State*, 9 S.W.3d 929, 930–31 (Tex.App.– Beaumont 2000, no pet.); *State v. Cerny*, 28 S.W.3d 796, 800–01 (Tex.App.–Corpus Christi, no pet.); *Martinez v. State*, 29 S.W.3d 609, 611–12 (Tex.App.–Houston [1st Dist.]

We must therefore critically examine the Austin court's holding in *Hernandez*.[7]

The Austin court derived its conclusion largely from the structure of the provision as it was enacted in 1947. Because former Article 6701d, Section 60(a), was not broken down into subsections, *see* note 1, *ante*, the Austin court believed that the Legislature must have intended that, before an offense can occur, an operator must commit both infractions listed in the statute; he must fail to maintain a single lane, *and* it must be the case that to change lanes would be unsafe under the circumstances. 983 S.W.2d at 871.[8] And, the Austin court reasoned, even though the Legislature *did* break the statute down into separate subsections when it codified the provision in the Transportation Code in 1995, *see* note 1 *ante*, no substantive change was intended by this codification. *Id.* (citing Acts 1995, 74th Leg., ch. 165, § 25, p. 1871 ("This Act is intended as a recodification only, and no substantive change in law is intended by this Act.")).

In support of its construction, the Austin court relied in part upon *Atkinson*, quoting the Fourteenth Court's enumeration of the elements of the offense as we have set them out above. 983 S.W.2d at 871. But we reject *Atkinson*'s formulation of the elements because Section 22 of the same legislation that first enacted Section 545.060's predecessor in 1947 also made it clear that it constitutes an offense either "to do any act forbidden or fail to perform any act required by this Act." [9] We do not think the fact that both the requirement (stay within a single lane as far as practical) and the prohibition (do not leave that lane unless it is safe to do so) originally appeared in the same subsection of the statute necessarily means that the Legislature intended that *both* must be violated before an offense has occurred. To interpret the statute as the courts of appeals in *Atkinson* and *Hernandez* have done essentially reads the requirement aspect (stay in a single lane as far as is practical) out of the statute, leaving only the prohibition aspect (do not change lanes when it is unsafe to do so) intact. This take on the statute violates a basic tenet of statutory construction—that we best accomplish the legislative intent by giving efficacy to all of the language in a statute and do not presume that the Legislature did a useless

2000, pet. ref'd); *Corbin v. State*, 33 S.W.3d 90, 93–94 (Tex.App.–Texarkana 2000), *rev'd on other grounds, Corbin v. State*, 85 S.W.3d 272 (Tex.Crim.App.2002); *Bass v. State*, 64 S.W.3d 646, 650–51 (Tex.App.–Texarkana 2001, pet. ref'd); *Eichler v. State*, 117 S.W.3d 897, 900–01 (Tex.App.–Houston [14th Dist.] 2003, no pet.); *Tyler v. State*, 161 S.W.3d 745, 748–49 (Tex.App.–Fort Worth 2005, no pet.); *State v. Huddleston*, 164 S.W.3d 711, 716 (Tex.App.–Austin 2005, no pet.); *Curtis v. State*, 209 S.W.3d 688, 693–94 (Tex.App.–Texarkana 2006), *rev'd on other grounds, Curtis v. State*, 238 S.W.3d 376 (Tex.Crim.App.2007); *Fowler v. State*, 266 S.W.3d 498, 502–04 (Tex.App.–Fort Worth 2008, pet. ref'd); *State v. Houghton*, 384 S.W.3d 441, 447–48 (Tex.App.–Fort Worth 2012, no pet.); *Miller v. State*, 418 S.W.3d 692, 696–97 (Tex.App.–Houston [14th Dist.] 2014, pet. ref'd). *See also United States v. Raney*, 633 F.3d 385,

392–93 (5th Cir.2011) (holding, based on the language of the statute alone, that Section 545.060(a) requires proof of both a failure to maintain a single lane and that such failure was unsafe under the circumstances and finding no evidence of a lack of safety in the case).

7. "Statutory construction is a question of law; therefore our review is de novo." *Mahaffey v. State*, 316 S.W.3d 633, 637 (Tex.Crim.App. 2010).

8. The Third Court stated: "We believe the statutory language shows a legislative intent that a violation of section 545.060 occurs only when a vehicle fails to stay within its lane *and* such movement is not safe or is not made safely." *Id.*

9. Acts 1947, 50th Leg. ch. 421, § 22, p. 970.

thing. *See* Tex. Gov't Code § 311.021(2) ("In enacting a statute, it is presumed that ... the entire statute is intended to be effective[.]"); [10] *Garza v. State*, 213 S.W.3d 338, 349 (Tex.Crim.App.2007) ("We must presume that in enacting a statute, the Legislature intends the entire statute to be effective, and did not intend a useless thing.") (internal quotation marks and brackets omitted); *Childress v. State*, 784 S.W.2d 361, 364 (Tex.Crim.App.1990) ("We will not presume the Legislature did a useless thing.").

Our construction of Section 545.060 (and our rejection of the *Atkinson/Hernandez* courts' interpretation) is consistent with our construction of an analogous Transportation Code statute, Section 550.021—the failure to stop and render aid statute. Tex. Transp. Code § 550.021; [11] *Huffman v. State*, 267 S.W.3d 902 (Tex.Crim.App. 2008). Like Section 545.060, Section 550.021 embodies multiple statutory requirements (namely, a requirement to "stop," "return," and "remain"), which are joined by the conjunction "and." Thus, it places a duty on the driver to do all three—or as many as may be appropriate, depending upon the facts of the particular accident scenario. Moreover, it makes it an offense to "not comply with the requirements of this section." In construing this provision for purposes of resolving a jury-unanimity issue, we held in *Huffman* that the three statutory requirements were alternative manners and means of committing the same offense, indicating that the defendant could be convicted for failing to comply with any one of them (and the jury did not have to be unanimous with respect to which one). 267 S.W.3d at 907–09.

■ Section 545.060 similarly joins its requirement aspect (to maintain a single lane as far as is practical) and its prohibition aspect (do not change lanes unless it is safe to do so) with the conjunction "and." Nevertheless, as with the failure to stop and render aid statute, we believe it evident that the Legislature intended a violation of either the requirement to maintain a single lane or the independent prohibition against changing lanes when conditions are not safe to do so constitute separately actionable offenses.[12] Thus, it is an offense to change marked lanes when it is unsafe to do so; but it is also an independent offense to fail to remain entirely with-

---

**10.** The Code Construction Act applies in construing the 1995 Transportation Code. *See* Tex. Gov't Code § 311.002(1) ("This chapter applies to ... each code enacted by the 60th or a subsequent legislature as part of the state's continuing statutory revision program[.]"); Acts 1995, 74th Leg., ch. 165, § 1, eff. Sept. 1, 1995 (enacting Transportation Code).

**11.** As of 2008, when we decided *Huffman*, Section 550.021 read:
 (a) The operator of a vehicle involved in an accident resulting in injury to or death of a person shall:
 (1) immediately stop the vehicle at the scene of the accident or as close to the scene as possible;
 (2) immediately return to the scene of the accident if the vehicle is not stopped at the scene of the accident; *and*

(3) remain at the scene of the accident until the operator complies with the requirements of Section 550.023.
 \* \* \*
 (c) A person commits an offense if the person does not stop or does not comply with the requirements of this section.
Tex. Transp. Code § 550.021 (emphasis added). This provision has been amended since *Huffman*, but still retains the three requirements to "stop," "return," and "remain."

**12.** Whether they are the same offense or different offenses for double-jeopardy/jury-unanimity purposes is a question we need not address today. For present purposes we simply hold that it is an offense under the statute *either* to fail to maintain a single lane in so far as is practical *or* to change lanes when it is not safe to do so.

in a marked lane of traffic so long as it remains practical to do so, regardless of whether the deviation from the marked lane is, under the particular circumstances, unsafe.[13]

The Austin court in *Hernandez* also believed that it would be prudent to import an element of "unsafety" into the requirement to maintain a single lane in order to avoid the injection of a certain "vagueness" into the statute. After discussing the structure of the statute, *Hernandez* observed:

> Moreover, the very vagueness of the requirement that the operator of a vehicle drive within a single lane "as nearly as practical" indicates that the legislature did not intend for the initial clause of the statute to create a discrete offense apart from some element of unsafety. This conclusion is bolstered by the use of the term "practical" rather than "practicable." The latter term has a somewhat more definite meaning: "capable of being accomplished; feasible; possible," while the former term is more ambiguous: "manifested in practice; capable of being put to good use." Bryan A. Garner, *A Dictionary of Modern Legal Usage* 678 (2d ed.1995).

983 S.W.2d at 871. We do not share this concern.

The Austin court invoked a definition of "practical" which identifies it as a synonym for the word "useful." *See* WEBSTER'S II: NEW COLLEGE DICTIONARY at 867 (1999) (providing one definition of "practical" to be "4. Capable of being used or put into effect: USEFUL). We doubt that the Legislature intended this definition to apply to the requirement element of Section 545.060(a), so as to require an operator to maintain a single lane of traffic so long as it is in some sense *useful* to do so.[14] The word "practical" has another dictionary definition that far more likely captures what the Legislature had in mind when requiring a driver to stay within a single marked lane of traffic. The word may also mean (and in the context of Section 545.060(a), almost certainly was intended to mean): "7. Having or displaying good judgment: SENSIBLE." *Id.* By this understanding, Section 545.060 requires that an operator maintain a single marked lane of traffic except when it may be "sensible"— where "good judgment" under the circumstances may permit him—to deviate. Failing to stay entirely within a single lane is not an offense if it is prudent to deviate to some degree to avoid colliding with an unexpected fallen branch or a cyclist who has strayed from his bike lane. But indiscriminate and purposeless swerving is its own actionable offense under Section 545.060, regardless of whether the particu-

---

**13.** *See also Lothrop v. State*, 372 S.W.3d 187, 191 (Tex.Crim.App.2012) (Section 545.058(a) of the Transportation Code permits an operator to drive on an improved shoulder if to do so is necessary to accomplish one of seven enumerated goals "and may be done safely[.]" TEX. TRANSP. CODE § 545.058(a). The offense "can be proved in one of two ways; either driving on the improved shoulder was not a necessary part of achieving one of the seven approved purposes, or driving on the improved shoulder could not have been done safely").

**14.** This is the variation of "practical" that Garner focuses on to distinguish it from "practicable," noting that, "[t]hough similar," they "should be distinguished in use." Garner, *supra*, at 678. He also notes that "[t]he word ["practical"] is most frequently contrasted with *theoretical*." *Id.* Again, we do not believe the Legislature intended that an operator should be required to maintain a single marked lane of traffic so long as it is practical—as opposed to *theoretical*—to do so. "Words ... shall be read in context[,]" TEX. GOV'T CODE § 311.011(a), and here, the context counsels against such a construction.

lar circumstances permit such deviation to occur without endangering anyone. We find no intolerable vagueness in this discrete requirement.

 Did Gilow have a reasonable suspicion that Appellant failed to drive as nearly as practical *entirely within* a single lane of traffic? The court of appeals was doubtful of the trial court's finding of fact that the video "clearly show[ed]" Appellant's Jeep actually swerved from his lane into the adjacent lane. *Leming*, 454 S.W.3d at 82–83. Gilow could only testify that the "tires were on the stripes." The video establishes that much, but it does not "clearly show[ ]" that the Jeep entered into the next lane. Does driving on the divider stripes constitute a failure to stay "entirely within" a designated lane? We need not answer that question here because, for a peace officer to stop a motorist to investigate a traffic infraction, as is the case with any investigative stop, "proof of the actual commission of the offense is not a requisite." *Drago v. State*, 553 S.W.2d 375, 377 (Tex.Crim.App.1977); *Valencia v. State*, 820 S.W.2d 397, 400 (Tex.App.–Houston [14th Dist.] 1991, pet. ref'd); *Joubert v. State*, 129 S.W.3d 686, 688 (Tex.App.–Waco 2004, no pet.); *Johnson v. State*, 365 S.W.3d 484, 489 (Tex.App.–Tyler 2012, no pet.). We agree that this principle is as true of the offense of failing to maintain a single lane as with any other traffic infraction. *See Powell v. State*, 5 S.W.3d 369, 376–77 (Tex.App.–Texarkana 1999, pet. ref'd), *cert. denied*, 529 U.S. 1116, 120 S.Ct. 1976, 146 L.Ed.2d 805 (2000) (applying *Drago* in the context of Section 545.060 of the Transportation Code). Gilow knew from personal observation that Appellant had several times at least come very *close* to entering the adjacent lane—even if he could not quite tell whether Appellant had actually entered it—and he knew that Arliss had also observed the Jeep to be "swerving" even before Gilow arrived on the scene. This was sufficient information to justify a temporary detention to investigate whether Appellant had actually failed at some point to remain in his dedicated lane of traffic as far it was practical to do so under the circumstances. It matters not whether that failure was unsafe.

## III. DRIVING WHILE INTOXICATED

Moreover, and in any event, there was also an objective basis by which Gilow could have harbored a reasonable suspicion that Appellant was driving while intoxicated, and he could have detained Appellant to investigate that offense as well. To that analysis, we turn next.

### Discretionary Reviewability

 A party who prevails in the trial court, as the State did in this case, but subsequently loses in the intermediate appellate court, is permitted to raise an argument for the first time in his petition for discretionary review to justify overturning the appellate court's judgment and reinstating the judgment of the trial court. *Volosen v. State*, 227 S.W.3d 77, 79, 80 (Tex.Crim.App.2007); *Rhodes v. State*, 240 S.W.3d 882, 886 nn. 8, 9 (Tex.Crim.App. 2007); *Morris v. State*, 361 S.W.3d 649, 670 n. 117 (Tex.Crim.App.2011); George E. Dix & John M. Schmolesky, 43B Texas Practice: Criminal Practice and Procedure §§ 57:19, 57:39 (3d ed.2011). Although the State emphasized the community care-taking rationale for upholding Appellant's stop in this case at both trial and on appeal, it now argues that the trial court's ruling denying Appellant's motion to suppress should have been upheld on the basis that the record provides undisputed facts that, when viewed objectively, would have justified Gilow in stopping Appellant's Jeep in order to investigate

whether its driver was intoxicated. An appellate court should affirm a trial court's ruling so long as it is correct under any theory of law applicable to the case, even if the trial court did not rely on that theory. *State v. Esparza*, 413 S.W.3d 81, 85 (Tex. Crim.App.2013). "So long as the record is sufficiently well developed to support a correct ruling on an alternate 'theory of law applicable to the case,' the appellee need not have expressly relied upon it at trial." *Id.* at 86 n. 17.

## Standard of Review

 Here, the trial court ultimately concluded that Gilow "was justified in stopping the vehicle." This is in the nature of a legal conclusion—a conclusion about the legal significance of the facts as the trial court found them to be. With respect to the trial court's historical fact-finding, it found both that Gilow had received a report "from a named informant" that the Jeep was "driving erratically" and that Gilow himself had observed the Jeep "cross the center stripe and move partially into another lane of traffic." We give almost total deference to the trial court's resolution of issues of historical fact and credibility determinations so long as they are supported by the record. *E.g., Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim.App.2007). Whether there was reasonable suspicion to detain Appellant is not a function of Gilow's demeanor or credibility, but of the legal significance of the essentially uncontested facts.[15] The ultimate question of whether Gilow was indeed "justified in stopping" Appellant's Jeep, we review *de novo. Id.*

## Reasonable Suspicion

What we said in *Derichsweiler v. State*, in describing the standard for reasonable suspicion is pertinent here:

Under the Fourth Amendment, a warrantless detention of the person that amounts to less than a full-blown custodial arrest must be justified by a reasonable suspicion. A police officer has reasonable suspicion to detain if he has specific, articulable facts that, combined with rational inferences from those facts, would lead him reasonably to conclude that the person detained is, has been, or soon will be engaged in criminal activity. This standard is an objective one that disregards the actual subjective intent of the arresting officer and looks, instead, to whether there was an objectively justifiable basis for the detention. It also looks to the totality of the circumstances; those circumstances may all seem innocent enough in isolation, but if they combine to reasonably suggest the imminence of criminal conduct, an investigative detention is justified. * * * Moreover, the detaining officer need not be personally aware of every fact that objectively supports a reasonable suspicion to detain; rather, the cumulative information known to the cooperating officers at the time of the stop is to be considered in determining whether reasonable suspicion exists. A 911 police dispatcher is ordinarily regarded as a cooperating officer for purposes of making this determination. Finally, information provided to police from a citizen-informant who identifies himself and may be held to account for the accuracy and veracity of his report may be regarded as reliable. In such a scenario,

---

**15.** The only historical fact that seems to be in issue is whether or not the Jeep actually crossed the broken white stripe dividing the lanes of traffic or, instead, simply touched it—

"tires were on the stripes"—as Gilow testified. As will be seen, we do not deem that fact issue to be controlling. *See* note 16, *post*.

the only question is whether the information that the known citizen-informant provides, viewed through the prism of the detaining officer's particular level of knowledge and experience, objectively supports a reasonable suspicion to believe that criminal activity is afoot.

348 S.W.3d 906, 914–15 (Tex.Crim.App. 2011) (footnotes, citations, and internal quotation marks omitted).

■ The question here is whether Gilow had an objectively reasonable basis to suspect the driver of the Jeep to be intoxicated. "A person commits an offense if the person is intoxicated while operating a motor vehicle in a public place." TEX. PENAL CODE § 49.04(a). "Intoxicated means ... not having the normal use of mental or physical faculties by reason of the introduction of alcohol, a controlled substance, a drug, a dangerous drug, a combination of two or more of those substances, or any other substance into the body[.]" TEX. PENAL CODE § 49.01(2)(A). The United States Supreme Court has recently acknowledged that observation of "dangerous behaviors" such as weaving back and forth across the roadway and crossing the center line "would justify a traffic stop on suspicion of drunk driving." *Navarette v. California*, —— U.S. ——, 134 S.Ct. 1683, 1690–91, 188 L.Ed.2d 680 (2014). Moreover, while it is true that such behavior "might also be explained by, for example, a driver responding to an unruly child or other distraction[,]" the Supreme Court has "consistently recognized that reasonable suspicion need not rule out the possibility of innocent conduct." *Id.* at 1691 (internal citations and

quotation marks omitted). This Court has said the same. *See Woods v. State*, 956 S.W.2d 33, 38 (Tex.Crim.App.1997) ("[T]he 'as consistent with innocent activity as with criminal activity' construct is no longer a viable test for determining reasonable suspicion."). "It is, after all, only an 'investigative' detention. So long as the intrusion does not exceed the legitimate scope of such a detention and evolve into the greater intrusiveness inherent in an arrest-*sans*-probable-cause, the Fourth Amendment will tolerate a certain degree of police proaction." *Derichsweiler*, 348 S.W.3d at 916.

■ Gilow received information through his dispatcher that a partially-identified informant, "Arliss," had observed a white Jeep "swerving from side to side." This information was not only within the cumulative knowledge of the police, it was actually conveyed by the dispatcher to Gilow. When Gilow caught up to Arliss, he was still following the Jeep, but Arliss backed off at Gilow's instruction. Gilow then fell in behind the Jeep and followed it for several miles, recording it before eventually stopping it. Gilow himself observed the Jeep to be traveling unusually slowly and "swerving" fairly radically—at least within the width of its own dedicated lane, even if not, as the trial court believed, beyond it.[16] The dash cam video bears this out. Thus, Arliss's tip was corroborated. Whatever doubt may have originally existed as to Arliss's reliability as an informant on account of his relative anonymity was dispelled by Gilow's own verification of his

---

**16.** The trial court and the court of appeals disagreed with respect to whether the Jeep ever actually crossed the broken white stripes dividing the lanes of traffic. *Leming*, 454 S.W.3d at 82–83. Gilow testified only that the "tires were on the stripes." Having viewed the dash cam ourselves, we agree with

Gilow and the court of appeals that this is as much as may be said definitively. The record does not support the trial court's finding of fact, at least inasmuch as it found that the video "clearly shows" that Appellant encroached into the next lane.

report.[17] The combination of Arliss's tip and Gilow's own corroborating observations suggests that the Jeep had indeed been "swerving" for some time and distance even before Gilow arrived.[18] What is more, twice Gilow observed the Jeep nearly strike the curb, and the Jeep continued to drift back and forth within its lane, if to a somewhat lesser extent, for some time and distance even after the driver should have noticed Gilow's squad car in his rear-view mirror following directly behind him. The Jeep was traveling well below the posted speed limit when Gilow first observed it, and it continued to slow down more and more by the minute, all while continuing to weave back and forth. This suggests an inability on the driver's part to completely control his mental or physical faculties—even knowing it was in his immediate best interest to do so.[19]

"Reasonable suspicion depends on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. Under that commonsense approach, we can appropriately recognize certain driving behaviors as sound indicia of drunk driving." *Navarette*, 134 S.Ct. at 1690 (internal citation and quotation marks omitted). We hold that, on the facts of this case, Gilow had an objectively reasonable basis to justify at least a temporary detention to investigate the cause of Appellant's unusual driving, even if Appellant's "erratic driving" (as the trial court aptly characterized

17. "Another indicator of [the] veracity [of an informant] is [his] use of the 911 emergency system[,]" because "a reasonable officer could conclude that a false tipster would think twice before using such a system." *Navarette*, 134 S.Ct. at 1689–90. In the instant case, the record does not definitively establish whether "Arliss" reported Appellant's swerving via the 911 system, but it is clear enough that he contacted the police dispatcher in *some* fashion, and Gilow testified at the suppression hearing that he supplied both his partial name and his telephone number. Moreover, Arliss continued to follow the Jeep until Gilow arrived. Thus, he "identified [himself] . . . and remained answerable for [his] report after the fact." *Derichsweiler*, 348 S.W.3d at 915. Under these circumstances, and in view of Gilow's own observations corroborating the information Arliss provided, we reject the court of appeals's assertion that "the trial court was given no reason to believe that Gilow was responding to anyone more believable than an anonymous caller." *Leming*, 454 S.W.3d at 83–84.

18. It is also worth noting that Gilow's observation and Arliss's observation are not the same specific and articulable fact. They are discrete *instances* of similar specific and articulable facts, and, as such, they serve to establish, in the totality of circumstances, that the driver of the Jeep had been swerving, albeit within the same lane, for some considerable time and distance—even longer than the two miles or so during which Gilow followed him. Even before Gilow's observations began, the Jeep had been swerving enough to alarm a fellow citizen-driver to the point that he felt obliged to report it to the authorities. Our opinion today should not be read for the proposition that an isolated swerve within a single lane of traffic will justify an officer in instigating a traffic stop to investigate the possibility of driving while intoxicated. But those are not the facts of this case, and we believe it would be a mistake to hold that an officer may never conduct an investigative stop for driving while intoxicated on the basis of *sustained* and *significant* weaving unless the driver at some point left his own lane.

19. Thus, the Jeep's sustained and significant swerving was not the only circumstance suggesting that its driver was intoxicated. It may not be unusual for a driver to slow down to the posted speed limit when he notices a police car in traffic behind him. It may not even be unusual for a driver to slow down to *below* the posted speed limit if he was unaware of exactly how fast he was driving when he noticed a police officer in his rearview mirror. But for a driver who is already proceeding at significantly *less* than the posted limit to slow down *even more*—particularly a driver who cannot seem to avoid swerving—suggests a consciousness of impairment.

it) might ultimately have proven to derive from some other, innocent cause. "A determination that reasonable suspicion exists ... need not rule out the possibility of innocent conduct." *Jaganathan v. State,* 479 S.W.3d 244, 248 (Tex.Crim.App.2015) (quoting *United States v. Arvizu,* 534 U.S. 266, 277, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)). "The possibility of an innocent explanation does not deprive the [detaining] officer of the capacity to entertain reasonable suspicion of criminal conduct. Indeed, the principal function of his investigation is to resolve that very ambiguity and establish whether the activity is in fact legal or illegal[.]" *Woods,* 956 S.W.2d at 37 (quoting *In re Tony C.,* 21 Cal.3d 888, 894, 148 Cal.Rptr. 366, 369, 582 P.2d 957, 960 (1978)). Even had Gilow's investigative detention of Appellant ultimately failed to uncover signs of inebriation, the stop would nevertheless have served the salubrious function to alert Appellant, if he did not already know, that his driving was erratic enough—whatever the cause—to raise suspicion of drunk driving, alarm fellow motorists, and potentially endanger himself and others.[20] We would deem it counterproductive and contrary to common sense to set the reasonable-suspicion bar for driving while intoxicated so high that law enforcement must hesitate to investigate such hazardous driving for fear that the stop will later be invalidated.

## IV. CONCLUSION

The trial court did not err to conclude that "the officer was justified in stopping the vehicle." Gilow had reasonable suspicion to detain Appellant to investigate both the offense of failing to maintain a single lane of traffic and the offense of driving

20. That Appellant's driving was not as blatantly dangerous as some of the examples mentioned in *Navarette* does not mean that it was not sufficiently hazardous as to justify at least an investigative detention.

while intoxicated. We accordingly reverse the court of appeals's judgment and reinstate the trial court's judgment.

Richardson, J., filed a concurring opinion in which Meyers, J., joined.

Keasler, J., filed a dissenting opinion in which Johnson and Hervey, JJ., joined.

Newell, J., filed a dissenting opinion.

Richardson, J., filed a concurring opinion in which Meyers, J., joined.

I agree with in the majority's conclusion that Manfred Gilow, a Longview police officer, had reasonable suspicion to detain Appellant in order to investigate the offense of driving while intoxicated. I also agree with the court's decision to reverse the court of appeals's judgment and reinstate the trial court's judgment.

I agree that Officer Gilow had an "objectively justifiable basis" for the detention because he had "specific, articulable facts that, combined with rational inferences from those facts, would lead [a police officer] reasonably to conclude that the person detained is, has been, or soon will be engaged in criminal activity."[1] Such specific, articulable facts are that Officer Gilow was notified of a citizen's report of a white jeep vehicle on the road that was "swerving from side to side;" when following the jeep, Officer Gilow observed that Appellant was traveling thirteen miles per hour below the posted speed limit; and that Appellant was swerving within his lane, almost hitting the curb a few times. As pointed out by the majority, these facts provide an objectively justifiable basis for any police officer to reasonably conclude

1. *Derichsweiler v. State,* 348 S.W.3d 906, 914–15 (Tex.Crim.App.2011).

that Appellant could be driving while intoxicated.

Moreover, I do not disagree with the majority's analysis of Transportation Code § 540.060. The statute provides that a driver "shall drive as nearly as practical entirely within a single lane," *and* a driver "may not move from the lane unless that movement can be made safely." This means that a person *could* be in violation of that statute if he or she fails to do *either one* of the required actions. This interpretation does not turn the "and" into an "or." The "and" means that *both* are statutory requirements. It is the *potential violation of the statute* that incorporates the "or."[2]

Finally, even though, in its petition for discretionary review, the State seemingly abandoned its argument regarding the community caretaking exception, I believe it, too, provided justification for the officer's stop. An officer's community caretaking function may be invoked where an officer stops to assist an individual "whom a reasonable person—given the totality of the circumstances—would believe is in need of help."[3] Given the totality of the circumstances here, consistent with Officer Gilow's testimony that he believed Appellant might have been "somewhat impaired," a reasonable person would believe that Appellant may have been in need of help because of the way he was driving.

With these additional comments, I join the majority opinion.

Keasler, J., filed a dissenting opinion in which Johnson and Hervey, JJ., joined.

In a motion to suppress, James Leming argued Officer Gilow lacked reasonable suspicion to initiate the traffic stop that led to his arrest for driving while intoxicated. Addressing the arguments before it, the court of appeals held the officer lacked reasonable suspicion to detain Leming for violating the Transportation Code and that the stop was unreasonable under the community-caretaking function. We granted all of the State's grounds for review, including whether Transportation Code § 545.060(a) requires an unsafe movement. Admittedly, based on reasonable suspicion of criminal activity alone, this is a close case. I dissent because the majority reaches the wrong result by misconstruing the statute and finds reasonable suspicion on the basis of a single insufficient articulable fact.

## I. Facts and Procedural History

At the suppression hearing, Officer Gilow testified to his observations before detaining Leming. The record reveals the following facts.

- Around 2:00 p.m. on January 20, 2012, dispatch notified Officer Gilow that a tipper reported a white jeep "swerving from side to side."
- Officer Gilow responded and followed the white Jeep and observed the Jeep for about two miles.

---

**2.** This is somewhat analogous to how jury charges are drafted. For example, in the context of a self-defense jury charge instruction, a person's belief that force used in self-defense was immediately necessary is presumed to be reasonable if three requirements are met (the word "and" is used). TEX. PENAL CODE § 9.31(a). That presumption applies unless the State proves beyond a reasonable doubt that the facts giving rise to the presumption do not exist. TEX. PENAL CODE § 2.05(b)(2)(A). This means that if the State disproves any one of the three required ac-

tions—one, two, *or* three—then the presumption will not apply. Here, section 540.060 places two requirements on drivers. A violation can occur if the driver fails to do one *or* the other.

**3.** *Wright v. State,* 7 S.W.3d 148, 151 (Tex. Crim.App.1999). *See also, Corbin v. State,* 85 S.W.3d 272 (Tex.Crim.App.2002) and *Gonzales v. State,* 369 S.W.3d 851 (Tex.Crim.App. 2012).

- Officer Gilow observed the Jeep drift within its lane.

- Officer Gilow clocked the vehicle traveling about 32 miles per hour in a 45 mile per hour speed zone, but no minimum speed limit is posted.

- Officer Gilow testified that "traffic was pretty good" and "heavy."

- Officer Gilow was concerned that Leming may have had a "medical issue ... [such as] diabetic shock," and then stopped the Jeep.

- Officer Gilow later arrested Leming for DWI after Leming admitted to taking clonazepam and hydrocodone.

Concluding that the stop was lawful, the judge denied Leming's motion, and found that (1) dispatch informed Officer Gilow of a tip that Leming was "driving erratically" and (2) the dash-cam video "clearly show[ed]" Leming failed to maintain a single lane as required by the Transportation Code.

## II. Analysis

### A. Failure to Maintain a Single Lane

The majority spends considerable time de-constructing the decades-old courts of appeals' opinions in *Atkinson*[1] and *Hernandez*,[2] taking issue with the courts' statutory interpretation of § 540.060 and its predecessors.[3] Those courts' historical ac-

counts regarding the statute's predecessor are largely irrelevant. According to the majority, the courts of appeals' undoing in *Atkinson* and *Hernandez* was omitting from its analysis the 1947 legislative language that " 'to do any act forbidden or fail[ure] to perform an act required by this Act.' "[4] But relying on this language merely assumes what the Court's incorrect conclusion—that the statute's "and" means "or." We should instead interpret the current statute by its plain language, structure, and apparent purpose.

A driver fails to maintain a single lane when "[a]n operator on a roadway divided into two or more clearly marked lanes for traffic: (1) shall drive as nearly as practical entirely within a single lane; and (2) may not move from the lane unless that movement can be made safely."[5] We interpret statutes by examining the statute's text and give effect to the text's plain meaning.[6] We deviate from this practice only when doing so would lead to absurd results the Legislature could not have intended or when the statute is ambiguous.[7] Should either circumstance arise, we may then turn to extratextual sources to discern the Legislature's intent.[8]

To start, the Transportation Code § 545.060(a)'s plain meaning is clear and unambiguous. "Practical" in this case, means "real as opposed to theoretical"[9] or "disposed to action as opposed to specula-

---

1. *Atkinson v. State*, 848 S.W.2d 813 (Tex. App.–Houston [14th Dist.] 1993, no pet.).

2. *Hernandez v. State*, 983 S.W.2d 867 (Tex. App.–Austin 1998, pet. ref'd).

3. *See ante*, at 556–59.

4. *See ante*, at 558 (quoting Acts 1947, 50th Leg. Ch. 421, § 22, p. 970).

5. Tex. Transp. Code § 545.060(a)(1–2) (West 2013).

6. *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim.App.1991). *See also* Tex. Gov't Code § 311.011(a) (requiring words to be read in context of one another).

7. *Id.*

8. *Id.* at 785–86.

9. Black's Law Dictionary 1361 (10th ed.2014).

tion or abstraction."[10] "Safely" means, "free from harm or risk," "secure from threat of danger, harm, or loss," or "affording safety or security from danger, risk, or difficulty."[11] The conjunction "and" joins the statute's two requirements: that a driver shall stay within a single lane to the extent it is practical and leave the lane only when it is safe to do so.

Contrary to the majority's position, the "and" should not be read as an "or."[12] While there are times "and" can mean "or," it is simply not the case here. Professor Garner offers an example: " 'Prisoners' cases are usually heard before federal magistrates and district court judges.' "[13] This sentence does not mean that both federal magistrates and district court judges hear the cases simultaneously.[14] Rather, the sentence means that either federal magistrates or district court judges hear these cases.[15] But "and" typically means that both the words or phrases on either side are required.[16] A more basic example is "cruel and unusual punishment" or "necessary and proper."[17] An implicit "both" read before each word or phrase further clarifies this meaning.[18]

In the same way, the statute requires drivers to both drive in a single lane and not move from that lane unless it can be done safely. This is evidenced by the "and" joining the two provisions and is how we commonly understand the term. To give effect to the entire statute, the two requirements must be read together. A plain reading shows that both (a)(1) and (a)(2) are requirements, dependent on one another. To read the statute otherwise, as the majority does, overlooks the two requirements' interconnectedness. Common sense tells us that leaving an obstructed lane necessarily requires movement from that lane. It then follows that, to promote the statute's apparent objective to ensure roadway safety, the requirement that leaving the lane be done safely becomes operative at the time when driving in a single lane is no longer practical.

But under the majority's interpretation, the driver could be subject to two punishable offenses: one for leaving the lane if it was impractical and one for leaving the lane unsafely.[19] Ironically, this reading does what the Court finds objectionable in its review of older courts of appeals' opinions. Indeed, following the majority's analysis, we would read "safe" out of the statute by requiring a driver to remain in the lane only when it is practical to do so.[20] But reading the code with the correct use of "and" provides a single complete offense and avoids creating future unnecessary double-jeopardy issues and potential conflict with another Transportation Code section.[21]

10. Merriam–Webster's Collegiate Dictionary 914 (10th ed.1997).

11. Id. at 1030.

12. See ante, at 557.

13. Bryan Garner, A Dictionary on Modern Legal Usage 55 (2d ed.1995).

14. Id.

15. Id.

16. Antonin Scalia and Bryan Garner, Reading Law: The Interpretation of Legal Texts 116 (2012).

17. Id.

18. Id.

19. See ante, at 560 (explaining that § 540.060(a)(1) is a wholly "independent offense" from § 540.060(a)(2)).

20. See ante, at 560–61 (discussing the definition of "practical" as synonymous with "safe").

21. Cf. Tex. Transp. Code § 545.103 (West 2013) ("An operator may not ... move right or left on a roadway unless movement can be made safely.).

To further support this interpretation, the majority finds an analogy in a dissimilar statute. The failure to stop and render aid statute provides:

(a) The operator of a vehicle involved in an accident resulting in injury to or death of a person shall:

(1) immediately stop the vehicle at the scene of the accident or as close to the scene as possible;

(2) immediately return to the scene of the accident if the vehicle is not stopped at the scene of the accident; and

(3) remain at the scene of the accident until the operator complies with the requirements of Section 550.023.

. . .

(c) A person commits an offense if the person does not stop or does not comply with the requirements of this section.[22]

The failure to stop and render aid statute's construction is entirely different than the statute here. The statute provides a list of required conduct. In a particular circumstance, failing to do any combination of § 550.021(a)(1),(2), or (3) is a punishable offense. We know this because § 550.021(a) first sets out the circumstances (the accident resulting in injury or death), that triggers required conduct (the operator shall) spelled out in the following enumerated sections.[23] The word "shall" in section (a) precedes each subsection that follows—"stop," "return," and "remain." In that instance, the Legislature require all three as the circumstances may necessi-

tate. If that was not clear enough, § 550.021(c) further provides support that a driver must stop and remain or stop, return, and remain.

However, § 540.060(a) is not written or constructed similarly. Unlike § 550.021, § 540.060 does not state "An operator on a roadway divided into two or more clearly marked lanes for traffic shall: (1) drive as nearly as practical entirely within a single lane; and (2) not move from a single lane unless that movement can be made safely." If the statute were worded this way, a driver would violate the statute by either failing to comply with subsections (1) or (2). But in the actual statute, nothing in section (a)'s lead in language—before the colon—suggests that subsections (1) and (2) can be read independently of one another. Subsection (1)—after the colon—begins with "shall;" subsection (2) begins with "may not." Had the Legislature intended § 545.060(a) to be read like § 550.021, it would have constructed the statute similarly. Therefore, the failure to stop and render aid statute is simply not helpful in interpreting the instant statute.

Likewise, the majority's citation to *Lothrop*[24] and its analysis of the driving on an improved shoulder statute[25] are equally inapplicable. The driving on an improved shoulder statute sets out permissible conduct when certain conditions are satisfied and includes permissible purposes.[26] And like the statute here, which allows a driver to move from the lane if it is impractical to remain in the lane and that requires move-

**22.** TEX. TRANSP. CODE § 550.021 (West, 2013).

**23.** *See Huffman v. State*, 267 S.W.3d 902 (Tex. Crim.App.2008) (interpreting the statute's "and" as an "or" based on the statute's construction and because the statute is a "circumstances surrounding the conduct offense).

**24.** *Lothrop v. State*, 372 S.W.3d 187 (Tex. Crim.App.2012).

**25.** TEX. TRANSP. CODE § 545.058(a)(1–7) (West 2013).

**26.** *Id.* (providing in pertinent part: "An operator may drive on an improved shoulder to the right of the main traveled portion of a roadway if that operation is necessary and may be done safely, but only:....").

ment from the lane be made safely, so too does driving on an improved shoulder allow a driver to drive on the shoulder if it is necessary and can be done safely.[27] While the majority plucks language from *Lothrop* suggesting the statute requires either that driving on the shoulder was unnecessary or that it was unsafe,[28] we went on to say: "Thus if an officer sees a driver driving on an improved shoulder, and it appears that driving on the improved shoulder was necessary to achieving one of the seven approved purposes, and it is done safely, that officer does not have reasonable suspicion that an offense occurred." [29] We concluded that an officer lacks reasonable suspicion that an offense occurred if the officer does not observe both that a driver drives on an improved shoulder unnecessarily and does so unsafely.[30] Therefore, the majority's reliance on *Lothrop* does not support its interpretation of § 540.060, and instead suggests the statute's two requirements be read together.

Applying this analysis to the facts here, Officer Gilow never testified that he had a reasonable belief that Leming failed to maintain a single lane. Even if the majority's reading of § 545.060 was correct, the record does not support finding reasonable suspicion that Leming committed one of the "actionable offenses." While the judge found as much, neither the video nor Officer Gilow's testimony support a finding that Leming left his lane. True, an officer is not required to have proof of the actual commission of the offense to make an investigative stop,[31] but the officer must testify to some reasonable belief or basis that some criminal activity is afoot. Officer Gilow did not testify that he saw Leming fail to remain in a single lane and that his movement from the lane was unsafe or saw any specific and articulable facts that permitted him to reasonably believe Leming committed this traffic violation. The majority also cites to the tip as a basis to believe that Leming failed to remain in his lane as practically as possible and incorrectly disregards whether that failure was unsafe. But for reasons explained below, the tip is insufficient to support a reasonable belief that Leming was committing, had committed, or was about to commit an offense. Officer Gilow lacked reasonable suspicion that Leming failed to maintain a single lane or reasonable suspicion that Leming was driving while intoxicated.

**B. Reasonable Suspicion**

We examine a search's reasonableness on a case-by-case basis.[32] A temporary detention may be reasonable, if justified by reasonable suspicion.[33] While the standard for reasonable suspicion is low, it is nevertheless a standard. It is an objective one that disregards the officer's subjective beliefs.[34] Reasonable suspicion exists if, based on the totality of the circumstances, the officer has specific, articulable facts, that taken together with ra-

27. *Lothrop,* 372 S.W.3d at 191.

28. *Ante,* at 560 n.13.

29. *Lothrop,* 372 S.W.3d at 191 (citing *Castro v. State,* 227 S.W.3d 737, 741 (Tex.Crim.App. 2007).

30. *Id.* at 190–91.

31. *See ante,* at 561 (citing *Drago v. State,* 553 S.W.2d 375, 377 (Tex.Crim.App.1977)).

32. *Nastu v. State,* 589 S.W.2d 434, 438 (Tex. Crim.App.1979), *cert denied,* 447 U.S. 911, 100 S.Ct. 3000, 64 L.Ed.2d 862 (1980).

33. *Derichsweiler v. State,* 348 S.W.3d 906, 914 (Tex.Crim.App.2011).

34. *State v. Kerwick,* 393 S.W.3d 270, 274 (Tex. Crim.App.2013) (citing *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *York v. State,* 342 S.W.3d 528, 536 (Tex.Crim.App.2011)).

tional inferences from those facts, lead him to conclude that the person detained actually is, has been, or soon will be engaged in criminal activity.[35] But the officer need not observe an actual crime; rather, some activity may be sufficient to establish reasonable suspicion,[36] even if those circumstances standing alone may be just as consistent with innocent activity as with criminal activity.[37] If a stop is not based on objectively specific and articulable facts, the risk of arbitrary and abusive police practices exceeds tolerable limits, thereby violating the Fourth Amendment.[38]

### C. The Tip

A large majority of the Court's analysis focuses on the tip. But the tip, and the information it contained, is largely irrelevant for reasons I later explain. The Court cites *Navarette* and *Derichsweiler* as controlling, yet neither case addresses the real issue in this case—whether weaving within a lane is alone sufficient to establish reasonable suspicion of DWI. In *Navarette v. California,* the Court dealt with an anonymous 911 tip and addressed the reliability of such a tip to support reasonable suspicion—not whether weaving within the lane, alone, satisfies reasonable suspicion.[39] The *Navarette* Court cited several cases stating that certain behaviors are "sound indicia of drunk driving," such as where the defendant weaved

"all over the roadway," "cross[ed] over the center line on a highway and almost caus[ed] several head-on collisions," "dr[ove] all over the road and [weaved] back and forth," or "dr[ove] in the median." [40] But in each of these cases, the officers and informants observed dangerous activities—more than merely weaving within the lane—that provided reasonable suspicion. Addressing the issue, the Court concluded the 911caller's tip was reliable because the tip included more than a hunch of criminal activity, the tip alleged that the driver "[ran] another car off the highway[,]"—something more than weaving within the lane.[41]

Likewise, *Derichsweiler* addressed a corroborated 911 caller's report as a basis for an officer's reasonable suspicion.[42] The issue in that case was whether the caller's information articulated specific facts and reasonable inferences from those facts that led to a reasonable conclusion that the defendant was in the process of or about to engage in criminal activity.[43] In other words, the Court decided whether the tip's information could be considered in the totality of the circumstances known to the officer as a basis to justify reasonable suspicion that the defendant was engaged in some type of criminal activity. Again, addressing the tip, we found the tip alleged specific facts that under the totality of the circumstances, supported the offi-

**35.** *Curtis v. State,* 238 S.W.3d 376, 380–81 (Tex.Crim.App.2007). *See also York,* 342 S.W.3d at 536.

**36.** *Stone v. State,* 703 S.W.2d 652, 654 (Tex. Crim.App.1986).

**37.** *Id.* (citing *York,* 342 S.W.3d at 536).

**38.** *Ford v. State,* 158 S.W.3d 488, 493 (Tex. Crim.App.2005) (quoting *Brown v. Texas,* 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979)).

**39.** —— U.S. ——, 134 S.Ct. 1683, 1690–91, 188 L.Ed.2d 680 (2014).

**40.** *Id.* (quoting *State v. Prendergast,* 83 P.3d 714, 715–16 (Haw.2004); *State v. Golotta,* 178 N.J. 205, 837 A.2d 359, 361 (2003); *State v. Walshire,* 634 N.W.2d 625, 626 (Iowa 2001) (internal quotation marks omitted)).

**41.** *Id.* at 1691.

**42.** 348 S.W.3d at 909–10.

**43.** *Id.* at 916–17.

cer's reasonable suspicion that criminal activity was about to occur.[44]

Here, the tip does not add anything to the calculus of reasonable suspicion under the totality of the circumstances because the officer personally observed Leming weave within his lane. Unlike the officer in *Derichsweiler* who detained the defendant after responding to the scene, Officer Gilow followed and observed Leming for almost two miles. The tip said nothing about Leming's driving that is consistent with impaired driving that Officer Gilow did not see himself. A tip that a driver is "swerving from side to side" and an officer's own observations of the same behavior does not afford that single observation any greater weight; it is the same specific and articulable fact. As such, the tip does not factor into our evaluation of whether reasonable suspicion existed under the totality of the circumstances. In certain circumstances a single articulable fact may satisfy reasonable suspicion, but this case does not warrant such a holding.

### D. Weaving Within the Lane

Our review for reasonable suspicion requires determining whether the facts known to the officer under the totality of the circumstances objectively permit an officer to conclude that "crime is afoot." A number of the courts of appeals have held that weaving within the lane is an insufficient basis to support reasonable suspicion for a traffic stop.[45] To be sure, weaving within the lane is a factor to consider in the totality of the circumstances and may

be "sound indicia of drunk driving,"[46] but that fact alone does not satisfy reasonable suspicion of DWI. The record here shows that Officer Gilow had but one fact to base his reasonable suspicion—Leming's weaving within his lane. The only fact the Court relies upon in finding reasonable suspicion is the officer observed Leming weaving within his lane.

With the principle that specific and articulable facts need not be criminal in and of itself, the Court waters down reasonable suspicion to almost no standard at all by creating permissible DWI investigations from weaving alone. In a DWI context, there are nearly infinite circumstances, that in theory, may indicate a loss of mental and physical faculties—speeding, failing to signal, following too closely, failing to turn on one's headlights at night, or driving onto the shoulder—even if these behaviors fall short of a Transportation Code offense. By the Court's rationale, anything short of an actual traffic violation would establish reasonable suspicion that a driver is driving while intoxicated. Obviously, if an officer observes an actual violation, the officer has more than reasonable suspicion of criminal activity. But that is not the case here. The Court would hold that a single behavior, theoretically or abstractly suggesting impairment, is alone, while not against the law, sufficient for reasonable suspicion.

What is more, the Court mischaracterizes the record and claims Leming swerved in his lane over a considerable amount of time and distance.[47] But this

44. *Id.* at 917.

45. *See, e.g., State v. Tarvin*, 972 S.W.2d 910, 912 (Tex.App.–Waco 1998, pet. ref'd) (holding that weaving within the lane, alone, is insufficient to support reasonable suspicion). *See also Hernandez v. State*, 983 S.W.2d 867 (Tex. App.–Austin 1998, pet. ref'd) (same); *State v. Cerny*, 28 S.W.3d 796 (Tex.App.–Corpus

Christi 2000, no pet.) (same); *State v. Huddleston*, 164 S.W.3d 711 (Tex.App.–Austin 2005, no pet.) (same); *Ehrhart v. State*, 9 S.W.3d 929 (Tex.App.–Beaumont 2000, no pet.) (same).

46. *Navarette*, 134 S.Ct. at 1690.

47. *Ante*, at 565 n. 20 (characterizing Leming's swerving as "sustained and significant").

claim is unsupported by either the record or the video. By its own account, the Court's factual recitation, consistent with the video, shows that Leming weaved within his lane for a period of about thirty seconds, all the while remaining in his lane. The record provides no support for the Court's contention that the tip provided anything more than Leming swerving in his lane. Nowhere in the record is there any information from which the officer or this Court can infer that Leming weaved within his lane for any length of time. Contrary to the Court's position, the existence of a tip, even if motivated by bona fide public safety concerns, is simply not enough to support reasonable suspicion. This is particularly so where the tip fails to add any additional facts supporting reasonable suspicion.

An observation of weaving within a single lane, which presumably is not a criminal violation, insufficiently supports reasonable suspicion for DWI because it is the only fact the officer witnessed. And in this case, it is an insufficient single fact. The Court also seems to believe that failing to stop doing what the Court already announces is sufficient for reasonable suspicion, is just more evidence of suspicion. It is an argument that simply bootstraps a single insufficient fact of swerving into reasonable suspicion. As explained above, the Court's rationale would equally hold that any driving behavior that someone may associate with DWI would be sufficient to execute an investigative detention for DWI. The Court's expansive holding that Officer Gilow had reasonable suspicion elevates weaving within the lane to establish reasonable suspicion *per se* for DWI.

I recognize that reasonable suspicion is a low standard, but it is nevertheless a meaningful one for a lawful Fourth Amendment detention. The Court's hold-ing today only increases the likelihood of fishing expeditions the Fourth Amendment protects against.

### III. Conclusion

I would find that a § 540.060(a) violation requires that (1) a driver leave his or her lane when it is impractical to remain in the lane and (2) move from the lane only when it is safe to do so. I would also find that Officer Gilow lacked reasonable suspicion to detain Leming. I would affirm the court of appeals' judgment and remand the case to the trial court for further proceedings consistent with this opinion.

Newell, J., filed a dissenting opinion.

I join Judge Keasler's dissenting opinion on the issue of the statutory construction of Section 545.060(a) of the Transportation Code because I, too, do not read "and" to mean "or." But on the issue of whether there was reasonable suspicion to stop Appellant for suspicion of DWI, it is, as Judge Keasler acknowledges, a close call. Though the State, as the prevailing party in the trial court, is permitted to raise a theory upholding the trial court's ruling in a petition for discretionary review, the court of appeals nevertheless did not have the opportunity to address that theory. *Leming v. State,* 454 S.W.3d 78 (Tex.App.–Texarkana 2014) (holding that facts did not support reasonable suspicion to believe a traffic violation occurred and that traffic stop was not justified under the community caretaking function). Given that this issue is not clear cut, I would remand the case so that the court of appeals can consider in the first instance whether that theory supports the trial court's ruling. *McClintock v. State,* 444 S.W.3d 15, 20 (Tex.Crim.App.2014) (" '[T]he proper disposition of a petition for discretionary review that correctly asserts that the lower court has failed to consider a complaint as

to the propriety of its ultimate disposition is for this Court, in the exercise of its supervisory authority, to remand the cause to the court of appeals to reach a "decision" on that question in the first instance.' ") (quoting *Sotelo v. State,* 913 S.W.2d 507, 510 (Tex.Crim.App.1995)). The parties make a number of arguments in support of their respective positions in this Court, and "our resolution of the issue (if any should even be necessary after a remand) would benefit from a carefully wrought decision from the court of appeals." *McClintock,* 444 S.W.3d at 21. I respectfully dissent.