**AFFIRMED; Opinion Filed August 27, 2019.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

No. 05-18-00660-CR

**MAGAN MARIE KRYZAK, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 195th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F15-48257-N**

# MEMORANDUM OPINION

Before Justices Myers, Molberg, and Carlyle
Opinion by Justice Myers

A jury convicted appellant Magan Marie Kryzak of manslaughter and assessed punishment at twelve years' imprisonment. In two issues, appellant contends she was egregiously harmed by error in the jury charge and that the State improperly stated the law during its closing argument. We affirm.

## BACKGROUND

On the evening of September 22, 2015, Officer Jeremy Hawthorne of the Seagoville Police Department was on patrol when he received a dispatch about a shooting that had occurred at an apartment complex on 300 Cypress Street, in the City of Seagoville, Dallas County, Texas. When he arrived on the scene, he saw Kevin Wofford, twenty-one years of age, laying on the ground next to a white vehicle. He was the victim of an apparent gunshot wound to the abdomen. A woman, appellant, twenty-two years old, was crouching over him. Hawthorne asked appellant

where the gun was, and she pointed towards the door of the car and said, "[I]t's in there." Hawthorne recalled that Wofford did not show any signs of life other than "some agonal breathing," and it appeared his body was "just basically shutting down."

Emergency medical technicians (EMTs) soon arrived and found Wofford laying on his back and unresponsive. He was transported to the hospital, where he was pronounced dead. The Dallas County Medical Examiner testified that Wofford suffered a gunshot wound to the torso—the lower chest to upper abdomen area. The bullet entered Wofford's upper abdomen from the front and traveled downward and slightly left to right, lodging in the front of the right buttock. The jury saw autopsy photographs of where the bullet had entered Wofford's body.

EMTs also tended to appellant at the crime scene, who they found sitting in the back of a police vehicle. They observed her, checked her out, and asked her what happened. The paramedics' report, which, along with appellant's medical records, was admitted into evidence, states that they had been dispatched to the location because of a possible assault victim. Appellant was taken to Texas Regional Medical Center at Sunnyvale, where she was examined and discharged to police custody several hours later. Her medical records include the following notation:

> As per patient, after domestic dispute, her boyfriend and her started fighting. As per patient, he choked her and hit her head to wall [sic] a few times, hit her multiple times in the face, threw her to the ground on cement. She tried to escape to her car, and he run [sic] after her trying to get her out of the car. She took gun under the seat and shoot him [sic]. Then she call [sic] 911 and to try to get him CPR.

The record also includes photographs of appellant that were taken by the police in the interview room of the Seagoville Police Department. The photos show some bruising on her arms, some red marks on her lower torso, and a small cut on her left leg, but there is no bruising and no marks on her neck, and the only apparent injury to her face is a cut on the lip.

The evidence at trial showed that Wofford and appellant had been involved in a romantic

relationship. Appellant was married to another man, and for several months the three of them lived together in Fort Worth, which was how appellant and Wofford met. Wofford eventually grew frustrated and wanted to end the relationship because appellant had said she was going to leave her husband for Wofford, but according to Wofford's friend, Kristopher Kade Tinsley, "she hadn't done it yet." Wofford and appellant's husband were not on friendly terms by this point, and they texted "each other and threaten[ed] each other a lot, very often." As Tinsley recalled, this involved invitations to fight, but as far as he knew they never actually fought.

The State introduced into evidence State's exhibits 54 through 108, screenshots of a series of text messages exchanged between appellant and Wofford on the 21st and 22nd of September, 2018. The screenshots were taken by the police from Wofford's phone after his mother brought it to them, and the messages were read into the record. The lengthy text message thread, which sheds some light on the increasingly turbulent nature of appellant's and Wofford's relationship, started at 10:26 p.m. on September 21st. During their conversation, Wofford repeatedly told appellant that he considered their relationship to be over, he no longer wanted to see her, and that she should not come to his apartment. Appellant, however, insisted that she cared for appellant, missed him, and wanted to see him. At 4:29 p.m. on September 22nd appellant texted to Wofford, "Well I'm on my way," followed by a frowning face emoji. He replied, "I don't care," and then he texted, "You stupid bitch." At 4:34 p.m. appellant replied, "What." This last text message was sent less than forty-five minutes before appellant shot Wofford.

Three neighbors who lived in apartments upstairs from Wofford testified that they heard people screaming on the day of the shooting; that they saw a portion of a physical altercation between a young man and young woman in the parking lot of the complex; and that they heard a gunshot. One of the neighbors testified that he could hear the woman screaming more. None of the neighbors witnessed the shooting. Security cameras located in the parking lot of Wofford's

–3–

apartment building recorded portions of the altercation and the shooting. The recordings did not include audio of the parties' voices.

The jury viewed the recordings, which showed appellant and Wofford engaged in a protracted argument and scuffle prior to the shooting. The video footage from the first security camera showed appellant standing in front of the entrance to Wofford's apartment at a time-stamp of 5:04 on September 22, 2018.[1] Wofford opened the door, grabbed something out of appellant's hand, threw it, and went back inside and closed the door. A few seconds later, he opened the door and appeared to say something to appellant, who then walked away, out of camera view, as Wofford followed her. At 5:05 he reentered the camera view, went into the building, and closed the door, leaving appellant standing in front of the door. Appellant appeared to say something, at which point Wofford went back outside. The two of them appeared to argue and Wofford went back into the building at 5:06, followed by appellant. At 5:07, Wofford opened the door, went outside, and briefly leaned against the door, blocking appellant on the other side. He then turned around and walked away, out of camera view, and appellant followed him. At 5:09, Wofford reentered the camera view and went back into the building. Appellant approached the door as though she was going to follow him, but before she could do that he opened the door and shoved her away. The two of them appeared to argue and appellant went back into the building at 5:10. A minute later, the door opened and appellant went back outside and started walking toward her car. Wofford followed her. It appeared from the video that appellant was crying and that Wofford was saying something to her. He gave appellant a quick shove in the back, pushing her away. She briefly turned around as though she said something to him, and the two of them walked out of camera view.

---

[1] Stephen Davis of the Seagoville Police Department testified that the time-stamp on the video feed was incorrect because it showed the time to be in the morning. The undisputed evidence at trial indicated that these events took place in the evening.

Seconds before the shooting, at a time-stamp of 5:12, the feed from another security camera showed appellant sitting in her car with the car driver's side door open. Wofford was standing with one hand propped on the car and his elbow was resting on top of the open door. Appellant and Wofford appeared to be arguing. Wofford leaned into the car for a moment, as though saying something, and then appellant's arms can be seen coming out the door as she and Wofford briefly struggled. Appellant attempted to exit the car, and Wofford, using his whole body, tried to shut the door on her to keep her inside the vehicle. Wofford released or lost his hold on the door and he fell to ground and landed on his side, as appellant simultaneously got out of the car holding a gun in her right hand and Wofford started clutching his abdomen with his right hand. Appellant put her left hand to her forehead and then covered her mouth, as if to express surprise or shock.

The jury also heard a recording of the 911 call appellant made after the shooting. In the recording, appellant stated to the operator that she had shot Wofford with a gun she kept under her car seat because he was hurting her. She told the 911 operator that she shot Wofford about five minutes before placing the call, and she claimed the shooting was an accident.

At the police station, appellant turned over her car keys to then-Sergeant Stephen Davis of the Seagoville Police Department.[2] The keys had a metal object shaped like a cartoon cat character, either "Felix the Cat" or "Hello Kitty," attached to them with a "lanyard." Davis testified that the object was fashioned as a weapon, and that it was "brass knuckles." He explained that if a person put the bottom of the object in the palm of her hand and placed her fingers through the eye holes of the object, the protruding cat ears would be extended and could cause damage to someone. Davis told the jury that brass knuckles are designed to cause serious bodily injury when striking another and that carrying brass knuckles was illegal in the State of Texas, constituting the crime of possessing a prohibited weapon. Photographs taken of the interior of appellant's car at the crime

---

[2] When he testified at trial, Davis held the rank of captain.

scene showed that appellant had the knuckles in her purse, which was in her car at the time of the shooting. The State offered the knuckles into evidence.

Appellant's theory of the case was that Wofford was violently attacking her, she was afraid he was going to inflict serious bodily injury to her, and she shot him accidentally and in self-defense. The defense did not argue Wofford was trying to kill appellant. But it called the jury's attention to the fact that Wofford was a "250-pound man,"[3] and it argued he was "certainly capable" of inflicting serious bodily injury on appellant, who was five feet, eleven inches tall and weighed only 133 pounds. The defense also argued Wofford was using appellant, that he was manipulative, and it called what happened "a lover's quarrel that escalated into something a lot worse."

The State argued that appellant was a proven liar, having lied to Wofford, her husband, and to the paramedics and her doctors. The State pointed out that appellant waited five minutes before calling 911, and claimed she did that because she was panicking and "trying to think of an excuse to tell the cops when they got there." The State maintained that appellant's account of the incident that she gave to paramedics and her doctors was contradicted by the evidence, including the security camera footage, which showed what actually happened. The State also argued there was no evidence Wofford ever hit appellant, or that he was abusive towards her.

The jury ultimately convicted appellant of manslaughter as charged in the indictment, and assessed punishment at twelve years' imprisonment. Appellant filed a motion for new trial that was overruled by operation of law, and this appeal followed.

## DISCUSSION

### I. Jury Charge Error

In her first issue, appellant argues the trial court's "instruction on the law of the defensive

---

[3] The evidence showed that Wofford weighed 244 pounds at the time of his death.

presumption as relevant to the defense of 'self-defense' was fundamentally defective" because it failed "to set forth the applicable law." Furthermore, this error was harmful to appellant because "it lessened the State's burden of proof on the issue."

We review a claim of jury charge error in a two-step process. *Emeory v. State*, No. 05–17–00458–CR, 2018 WL 3599032, at *4 (Tex. App.—Dallas July 27, 2018, no pet.) (mem. op., not designated for publication). We first determine whether error exists in the charge. *Price v. State*, 457 S.W.3d 437, 440 (Tex. Crim. App. 2015). If it does, we determine the harm resulting from the error. *Id*. The degree of harm necessary for reversal depends on whether the appellant preserved error in the trial court. *Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016). If, as in this case, the appellant did not preserve error, the error requires reversal only if it was "so egregious and created such harm that the defendant did not have a fair and impartial trial." *See id. See also Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015).

"Egregious harm is a 'high and difficult standard' to meet, and such a determination must be 'borne out by the trial record.'" *Villarreal*, 453 S.W.3d at 433 (quoting *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013)). "Jury charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Marshall*, 479 S.W.3d at 843. In conducting an egregious harm analysis, we consider the entire jury charge, the state of the evidence, counsel's arguments, and any other relevant information in the record. *Id*. We "are required to review the relevant portions of the *entire* record to determine whether appellant suffered actual harm, as opposed to theoretical harm, as a result of the error." *Id*.

The Texas Penal Code provides that "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." TEX. PENAL CODE ANN. §

9.31(a). Section 9.32 governs the use of deadly force in self-defense, and it provides in part:

> (a) A person is justified in using deadly force against another:
>
> > (1) if the actor would be justified in using force against the other under Section 9.31; and
> >
> > (2) when and to the degree the actor reasonably believes the deadly force is immediately necessary:
> >
> > > (A) to protect the actor against the other's use or attempted use of unlawful deadly force; or
> > >
> > > (B) to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery.

*Id*. § 9.32(a). The term "deadly force" in the context of self-defense means "force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." *Id*. § 9.01(3).

Section 9.32(b) provides that a person's belief under subsection (a)(2) that the deadly force was immediately necessary as described by that subsection is presumed to be reasonable if three requirements are met:

> (1) [the actor] knew or had reason to believe that the person against whom the deadly force was used:
>
> > (A) unlawfully and with force entered, or was attempting to enter unlawfully and with force, the actor's occupied habitation, vehicle, or place of business or employment;
> >
> > (B) unlawfully and with force removed, or was attempting to remove unlawfully and with force, the actor from the actor's habitation, vehicle, or place of business or employment; or
> >
> > (C) was committing or attempting to commit an offense described by Subsection (a)(2)(B);
>
> (2) did not provoke the person against whom the force was used; and
>
> (3) was not otherwise engaged in criminal activity, other than a Class C misdemeanor that is a violation of a law or ordinance regulating traffic at the time the force was used.

*Id*. § 9.02(b); *cf. Leming v. State*, 493 S.W.3d 552, 566 n. 2 (Tex. Crim. App. 2016) (Richardson,

J., concurring) (noting that, in reference to section 9.31(a), "a person's belief that force used in self-defense was immediately necessary is presumed to be reasonable if three requirements are met (the word 'and' is used).").  Subsections (c) and (d) of 9.32 govern when a person does not have a duty to retreat:

> (c) A person who has a right to be present at the location where the deadly force is used, who has not provoked the person against whom the deadly force is used, and who is not engaged in criminal activity at the time the deadly force is used is not required to retreat before using deadly force as described by this section.
>
> (d) For purposes of Subsection (a)(2), in determining whether an actor described by Subsection (c) reasonably believed that the use of deadly force was necessary, a finder of fact may not consider whether the actor failed to retreat.

TEX. PENAL CODE ANN. § 9.32(c), (d).

Section 2.05 instructs the trial court regarding the submission of the presumption to the jury. *See id.* § 2.05; *Hawthorne v. State*, No. 09–10–00034–CR, 2011 WL 846121, at *3 (Tex. App.—Beaumont Feb. 22, 2011, no pet.) (mem. op., not designated for publication).  Subsection (b) concerns a presumption favorable to the defendant, and it provides as follows:

> (b) When this code or another penal law establishes a presumption in favor of the defendant with respect to any fact, it has the following consequences:
>
>> (1) if there is sufficient evidence of the facts that give rise to the presumption, the issue of the existence of the presumed fact must be submitted to the jury unless the court is satisfied that the evidence as a whole clearly precludes a finding beyond a reasonable doubt of the presumed fact; and
>>
>> (2) if the existence of the presumed fact is submitted to the jury, the court shall charge the jury, in terms of the presumption, that:
>>
>>> (A) the presumption applies unless the state proves beyond a reasonable doubt that the facts giving rise to the presumption do not exist;
>>>
>>> (B) if the state fails to prove beyond a reasonable doubt that the facts giving rise to the presumption do not exist, the jury must find that the presumed fact exists;
>>>
>>> (C) even though the jury may find that the presumed fact does not exist, the state must prove beyond a reasonable doubt each of the

–9–

> elements of the offense charged; and
>
> > (D) if the jury has a reasonable doubt as to whether the presumed fact exists, the presumption applies and the jury must consider the presumed fact to exist.

TEX. PENAL CODE ANN. § 2.05(b).

At the time of this offense, "knuckles" were classified as a prohibited weapon in the State of Texas, and their possession was—and, at the time this opinion issued, it remains—a class A misdemeanor offense. *See id.* § 46.05(a)(2), (e), *repealed by* Act of May 25, 2019, 86th Leg., ch. 216 (H.B. 446), § 2, eff. Sept. 1, 2019.[4]

It was the trial court's responsibility to deliver to the jury "a written charge distinctly setting forth the law applicable to the case." TEX. CODE CRIM. PROC. ANN. art. 36.14; *Arteaga v. State*, 521 S.W.3d 329, 334 (Tex. Crim. App. 2017). In this case, because the trial court included a presumption-of-reasonableness instruction in the self-defense portion of the charge, the court was also required to include the instruction describing the State's burden of proof in section 2.05(b)(2) of the penal code as the law applicable to the case. *See* TEX. PENAL CODE ANN. § 2.05(b)(2); *Hollander v. State*, 414 S.W.3d 746, 754 (Tex. Crim. App. 2013) (Cochran, J., concurring) ("The moral of this story is that trial judges should not include a reference to any statutory presumption in the jury charge unless they have very carefully included all of the language of Section 2.05(a)(2) of the Penal Code which deals with charging the jury on presumptions.").

The jury charge in this case included the statutory definition of self-defense and a deadly-force self-defense instruction:

> A person is justified in using deadly force against another if she would be justified in using force against the other in the first place, as set out above, and when she reasonably believes that such deadly force is immediately necessary to protect

---

[4] The reenactment and amendment is not applicable to the case and the law in effect at the time of the offense applies. *See id.* § 5 ("The changes in law made by this Act apply only to an offense committed on or after the effective date of this Act. An offense committed before the effective date of this Act is governed by the law in effect when the offense was committed, and the former law is continued in effect for that purpose. For purposes of this section, an offense was committed before the effective date of this Act if any element of the offense occurred before that date.").

herself against the other person's use or attempted use of unlawful deadly force.

The term "reasonable belief," as used herein, means a belief that would be held by an ordinary and prudent person in the same circumstances as the defendant.

The term "deadly force" as used herein, means force that is intended or known by the person using it to cause, or in the manner of its intended use is capable of causing, death or serious bodily injury.

The charge also included the following instruction on the presumption of a reasonable belief:

The defendant's belief that deadly force was immediately necessary is presumed to be reasonable if the defendant:

(1) Knew or had reason to believe that the person or persons against whom deadly force was used was either:

a. Attempting to enter unlawfully and with force the defendant's occupied vehicle, or,

b. Attempting to remove unlawfully and with force the defendant from the defendant's vehicle; or

c. Committing or attempting to commit murder, robbery, and/or aggravated robbery;

AND

(2) The defendant did not provoke the person or persons against whom the deadly force was used; AND

(3) The defendant was not otherwise engaged in criminal activity, other than a Class C misdemeanor that is a violation of law or ordinance regulating traffic at the time the force was used.

This presumption applies unless the State proves beyond a reasonable doubt that the facts giving rise to the presumption as listed above do not exist. If the State fails to prove beyond a reasonable doubt that the facts giving rise to the presumption do not exist, you must find that the presumption exists. Even though you may find that the presumption does not exist, the State must prove beyond a reasonable doubt each of the elements of the offense charged.

Thus, the charge properly included the presumption-of-reasonableness instruction in section 9.32(b) and most of the instruction found in section 2.05(b)(2). However, appellant points out that the charge "wholly omitted" subsection (D) of 2.05(b)(2). *See* TEX. PENAL CODE ANN. § 2.05(b)(2)(D). The defense did not object to the jury charge on this basis, but appellant argues she

suffered egregious harm. The State responds that even assuming the charge was erroneous for failing to include one of the four subsections in 2.05(b) setting forth the State's burden of proof on the facts giving rise to the presumption of reasonableness, appellant was not egregiously harmed. The State argues that the charge as a whole communicated to the jury that it must believe the predicate facts supporting the presumption beyond a reasonable doubt before it could convict appellant of manslaughter; and even if the jury had received the full instruction, the evidence at trial proved the presumption did not apply. We agree that, assuming the charge was erroneous, appellant was not egregiously harmed.

In *Hollander v. State*, the trial court instructed the jury generally regarding the use of a presumption favorable to the State in a criminal mischief case. *See* TEX. PENAL CODE ANN. § 28.03(c) (containing presumption that person receiving economic benefit has knowingly tampered with tangible property). The trial court, however, wholly failed to include the language in section 2.05(a)(2) that instructed jurors that the State must prove the facts giving rise to the presumption beyond a reasonable doubt. *Hollander*, 414 S.W.3d at 749–50. The court stated that where the charge did not specifically inform jurors of the degree of confidence to which they must be convinced of the facts underlying a presumption, an instruction on the State's general burden to prove all the elements of the charged offense beyond a reasonable doubt failed "to educate the jurors" on the burden of proof the State must reach before they may rely on the presumption. *Id*. at 750; *compare* TEX. PENAL CODE ANN. § 2.05(a)(2) (presumption in favor of the State) *with* § 2.05(b)(2) (presumption in favor of the defendant). The court concluded "[i]t was never communicated to the jury in any form that it must believe the evidence substantiating the presumption beyond a reasonable doubt before it could convict the appellant." *See Hollander*, 414 S.W.3d at 753. Moreover, since the balance of the charge and the conduct of the parties did not correct the deficiency, and the predicate facts giving rise to the presumption were "hotly

contested," the court rejected the court of appeals' findings that the great weight of the evidence established the predicate facts and that the jury probably would have found those facts to be true beyond a reasonable doubt had it been required to do so. *See id.* The court held that the appellant was egregiously harmed by the omission of the section 2.05 language. *Id.*

In this case, the trial court omitted subsection (D) from the charge, but it properly included subsections (A), (B), and (C)—almost the entirety of section 2.05(b)(2). The charge specifically informed the jury that the State's burden of proof for the facts giving rise to the presumption was beyond a reasonable doubt, and that the State must still prove the offense charged beyond a reasonable doubt. Indeed, unlike the charge in *Hollander*, which only generally informed jurors that the State had to prove the appellant's guilt in that case beyond a reasonable doubt, the charge in this case informed jurors regarding the level of confidence they had to have in the evidence supporting the presumption before they could return a verdict of manslaughter. *See id.* at 749–50. Notwithstanding appellant's argument, the omission of subsection (D) did not, therefore, decrease the State's burden of proof. This factor weighs in favor of a finding of no egregious harm.

Turning to the arguments of counsel, nothing the parties said or did during the course of the trial, either in voir dire or during their closing arguments, informed the jury that, in accordance with the omitted subsection (D), if it had a reasonable doubt as to whether a presumed fact existed, "the presumption applies and the jury must consider the presumed fact to exist." *See* TEX. PENAL CODE ANN. § 2.05(b)(2)(D). The State argued during its closing statement that, given appellant's actions, the presumption of reasonableness did not apply. Defense counsel told the jury during his closing argument (on several occasions) that the burden of proof was on the State and it never shifted to the defense. The parties also argued extensively regarding how the presumption applied, but neither party mentioned the State's burden of proof regarding the presumption. This factor likewise weighs in favor of a finding of no egregious harm.

–13–

As for the state of the evidence, a review of the record as a whole does not lead us to conclude that if the jury had been given the subsection (D) instruction, it would have had a reasonable doubt regarding the existence of the predicate facts to support the presumption. As the court stated in *Hollander*:

> In an egregious-harm analysis, the question is not simply whether, when viewed in the light most favorable to the verdict, the jury *could* rationally have found predicate facts to a level of confidence beyond a reasonable doubt. Instead, a reviewing court must evaluate the likelihood, considering the record as a whole, that a properly instructed jury *would* have found the predicate facts to the requisite level of confidence.

*Hollander*, 414 S.W.3d at 751.

In this case, the three presumed facts under the first prong of the presumption of reasonableness, as set forth in the charge pursuant to section 9.32(b)(1), were that appellant knew or had a reasonable belief Wofford was either (1) "[a]ttempting to enter unlawfully and with force the defendant's occupied vehicle;" (2) "[a]ttempting to remove unlawfully and with force the defendant from the defendant's vehicle;" or (3) "[c]ommitting or attempting to commit murder, robbery, and/or aggravated robbery." The parties contested the first two of these presumed facts, but they did not contest that Wofford was attempting to kill appellant, nor did they appear to contest that he was trying to rob her. *See* TEX. PENAL CODE ANN. § 9.32(b)(1).

The evidence proved appellant did not know or have reason to believe Wofford was attempting to enter her occupied vehicle with force, unlawfully remove her by force, murder, or rob her. The jury viewed the security camera recording, which showed that in the seconds before appellant shot Wofford, he was forcefully attempting to close the door of appellant's car in an apparent attempt to force her to stay in the car. The video showed Wofford releasing or losing his hold on the door and falling to his ground clutching his abdomen as appellant simultaneously got out of the car holding a gun in her right hand. The medical examiner testified that the bullet entered Wofford's body from front to back and traveled in a *downward* path, indicating appellant was at a

–14–

higher angle. The evidence in the record that would suggest a different interpretation is the notation in appellant's medical records where she said she was fighting with her boyfriend and he "hit her multiple times in the face," and "threw her to the ground on cement." She claimed that "[s]he tried to escape to her car" and he ran after her "trying to get her out of the car," and this was when she took the gun out from under the seat and shot him. But that notation is contradicted by the recorded evidence Wofford was, as shown in the security camera footage, trying to force appellant to stay in her car when she shot him. Also, appellant's statement to the 911 operator that she accidentally shot Wofford and did so because he was hurting her did not support a finding that he was attempting to remove her from her car, occupy her car, murder, or rob her.

The record therefore shows that at the moment appellant shot Wofford, the State proved beyond a reasonable doubt that the facts giving rise to the presumption did not exist. *See* TEX. PENAL CODE ANN. § 2.05(b)(2)(A). Considering all of the evidence, a fully instructed jury would not have found in favor of appellant on the first prong of the presumption of reasonableness beyond a reasonable doubt. The presumption was, thus, inapplicable. *See id*. § 9.32(b)(1); *Villareal*, 453 S.W.3d at 440 (as part of egregious harm analysis, concluding that "even had the jury been properly instructed as to the presumption of reasonableness under Section 9.32(b), we conclude that the presumption was inapplicable to the facts of this case based on the lack of evidence to support the presumption.").

Additionally, the jury would not have found in favor of appellant beyond a reasonable doubt on the third prong of the presumption of reasonableness (in 9.32(b)(3)) because the evidence also proved appellant was engaged in criminal activity greater than a class C misdemeanor at the time she shot Wofford. Appellant turned in her key ring with the attached metal cartoon-cat-shaped object to the police when she was taken to jail. That metal object was introduced into evidence and shown to the jury. Photographs of the crime scene show the object was in her purse,

which was in her car at the time of the shooting. Although defense counsel tried to minimize the object as a "key chain trinket," Davis testified that the metal object was fashioned as a weapon, could be fitted into the palm of a person's hand to cause damage, and constituted "brass knuckles." He testified that "brass knuckles" are designed to cause serious bodily injury and that they were a prohibited weapon in the State of Texas—i.e., a class A misdemeanor. *See* TEX. PENAL CODE ANN. § 46.05(a)(2), (e). Consequently, the evidence proved appellant was engaged in a criminal offense at the time of the shooting—possession of a prohibited weapon. Again, the presumption was inapplicable. *See id.* § 9.32(b)(3); *Villareal*, 453 S.W.3d at 440 (defendant's admission that he threatened to beat up victim immediately prior to stabbing him reflected that he was otherwise engaged in criminal activity at the time of the stabbing and that he was ineligible to receive the benefit of a presumption-of-reasonableness instruction); *Lee v. State*, 415 S.W.3d 915, 925 (Tex. App.—Texarkana 2013, pet. ref'd) (where charge included misstatement of the law regarding section 9.32(b), appellant suffered no egregious harm, in part, because the evidence showed she was actively distributing drugs on the day of the offense and she would not be entitled to a presumption-of-reasonableness instruction).

We conclude that the jury charge as a whole provided the jury with the requisite level of confidence by which to evaluate the predicate facts giving rise to the presumption of reasonableness. Moreover, a review of the record as a whole shows that a jury fully instructed on subsections (A) through (D) of section 2.05(b)(2) would not have found the facts giving rise to the presumption in favor of appellant beyond a reasonable doubt. Appellant was not, therefore, egregiously harmed by the omission of subsection (D) of section 2.05(b)(2) from the charge, and we overrule appellant's first issue.

## II. Improper Jury Argument

In her second issue, appellant contends the trial court erred in overruling appellant's

objection that the State's closing argument improperly stated the law on when the use of deadly force is appropriate.

Appellant complains about the following argument made by the State during its closing statement:

> We're not talking about regular self-defense when we have a defendant that's been charged with aggravated assault and he has to use normal self-defense, which is non[-]deadly force. We're talking about deadly force self-defense, and that's a different kind of law.
>
> It's the kind of law that says that if somebody is trying to kill you, if somebody is trying to rob you, if somebody is trying to murder you, you have the right to use the kind of force they're using on you that you reasonably believed at the time.

The defense objected that the prosecutor's statement of the law was incorrect, arguing, "The law says that if someone is in fear of suffering bodily injury, not being killed." The trial court overruled the defense's objection, informing the jury: "You'll have the law back there when you start your deliberations. Remember, arguments are not the law."

As we have already discussed, the charge included instructions on self-defense and deadly-force self-defense. The application paragraph of the jury charge read as follows:

> Now, if you find from the evidence beyond a reasonable doubt that the defendant Megan [sic] Marie Kryzak on or about the 22nd day of September, 2015, in the County of Dallas and State of Texas, did cause the death of Kevin Wofford by shooting Kevin Wofford with a firearm, a deadly weapon, but you further find from the words or conduct or both of Kevin Wofford, it reasonably appeared to the defendant that her life or person was in danger and there created in her mind a reasonable expectation or fear of death or serious bodily injury from the use of unlawful deadly force at the hands of Kevin Wofford, and that acting under such apprehension, she reasonably believed that the use of deadly force on her part was immediately necessary to protect herself against Kevin Wofford's use or attempted use of unlawful deadly force, then you should acquit the defendant on the grounds of self-defense; or if you have a reasonable doubt as to whether or not the defendant was acting in self-defense on the occasion and under the circumstances, then you should give the defendant the benefit of that doubt and say by your verdict not guilty.

Permissible jury argument must fall within one of four areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) response to argument of opposing

counsel; or (4) plea for law enforcement. *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008). "It is not error for the State to quote or paraphrase the jury charge, even if the charge presents a negative instruction to the panel." *Whiting v. State*, 797 S.W.2d 45, 48 (Tex. Crim. App. 1990). Argument that misstates the law or is contrary to the court's charge is improper. *Id*.; *Burke v. State*, 652 S.W.2d 788, 790 (Tex. Crim. App. 1983). However, if a prosecutor's argument goes beyond the charge but does not make a statement contrary to the law or the charge, it is not error. *Grant v. State*, 738 S.W.2d 309, 311 (Tex. App.—Houston [1st Dist.] 1987, pet. ref'd) (citing *Mauldin v. State*, 628 S.W.2d 793, 795 (Tex. Crim. App. 1982)).

The erroneous overruling of a defendant's objection to a prosecutorial misstatement of the law is not constitutional in nature. *Herrera v. State*, 11 S.W.3d 412, 415 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd). Thus, we disregard the error unless the appellant's substantial rights were affected. TEX. R. APP. P. 44.2(b); *Herrera*, 11 S.W.3d at 415. "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *Herrera*, 11 S.W.3d at 415 (citing *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997)). A reviewing court considers three factors in evaluating whether a particular argument is harmless: (1) the severity of the misconduct (prejudicial effect); (2) curative measures; and (3) the certainty of the conviction absent the misconduct. *Martinez v. State*, 17 S.W.3d 677, 692–93 (Tex. Crim. App. 2000). In conducting the analysis, the appellate court looks to all the evidence and the court's charge, as well as the prosecutor's misstatement. *Herrera*, 11 S.W.3d at 415.

In this case, even if we assume the State's objected-to argument was improper and that the trial court erred in overruling the defense's objection, appellant was not harmed. *See Martinez*, 17 S.W.3d at 692–93. To begin with, defense counsel clarified the law regarding the right to use deadly-force in self-defense in his closing statement, arguing he had to "clear up" the State's argument:

We know that she's on the phone screaming as the—after the gun is discharged. He was hurting me. He was hurting me. I had to shoot, or I—it was an accident.

And, folks, the accidental part, I'm not sure exactly what they were talking about. The accidental part was because she had never an intention of causing harm.

And—and—and as I say that, I've got to cover—clear up one more thing because the prosecutor kept arguing it. And it's not the law. Was he trying to kill her? No. I have no allegation he was trying to kill her. And that's not the law that triggers self-defense.

The question is whether or not that person at that time was capable of inflicting serious bodily injury. And without doubt, a 250-pound man against Megan Kryzak [sic] on that date and that time and that manner was certainly capable of doing it and in the situation that she was in.

And we talked about that in voir dire. To decide this case, you have got to go back —try to take you back to—take yourself back to that time and put yourself in her shoes and look through her eyes as she's being violently attacked there in that car. The prosecutor said, well, Mr. Johnson said—he told you in opening statements there wasn't black eyes, broken bones. So, obviously, it's not—no, folks, that's not what I ever said. Because the law doesn't say that you have to wait until you're dead. The law doesn't say that you have to wait until you have a broken nose or a black eye. The law doesn't say that you have to be violently or mortally wounded before you have a right as a human being to defend yourself. It says you have that right if you are under attack.

Moreover, the jury charge correctly stated the law on self-defense and deadly-force self-defense, and it correctly applied the definitions to the facts in the application paragraph. The trial court did not instruct the jurors to disregard the prosecutor's statement, but the court did admonish them that they had the law and would have the law with them when they started their deliberations. The trial court also reminded the jurors that arguments are not the law. In addition, the jury charge informed the jury that "[w]hat the lawyers say is not binding upon you," as well as, "You are the exclusive judges of the facts proved, of the credibility of the witnesses and the weight to be given their testimony, but you are bound to receive and be governed by the law from the Court, which is now given to you." The charge, in other words, provided a correct statement of the law and instructed the jurors to disregard any statements of the law that conflicted with the law given in the charge. Absent evidence to the contrary, we must presume the jury followed the instructions set forth in

the court's charge. *See Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005); *Dotson v. State*, No. 05–09–01034–CR, 2011 WL 1288640, at *4 (Tex. App.—Dallas Feb. 28, 2011, pet. dism'd) (mem. op., not designated for publication). And based on our review of the record, we believe it was reasonably certain that the jury would have rejected appellant's self-defense claim and convicted her of manslaughter even absent the State's objected-to argument. Balancing the *Martinez* factors, we therefore conclude that any error in the trial court's overruling of the defense's objection to the State's closing argument was harmless error. *See Martinez*, 17 S.W.3d at 692–93; *Herrera*, 11 S.W.3d at 415. We overrule appellant's second issue.

We affirm the trial court's judgment.

/Lana Myers/
LANA MYERS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
180660F.U05

–20–



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

MAGAN MARIE KRYZAK, Appellant

No. 05-18-00660-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 195th Judicial District Court, Dallas County, Texas
Trial Court Cause No. F15-48257-N.
Opinion delivered by Justice Myers.
Justices Molberg and Carlyle participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 27th day of August, 2019.