

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-0799-19

### THE STATE OF TEXAS, Appellant

### v.

### SHEILA JO HARDIN

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE THIRTEENTH COURT OF APPEALS
### NUECES COUNTY

**NEWELL, J. delivered the opinion of the Court in which HERVEY, RICHARDSON, WALKER, SLAUGHTER and MCCLURE, JJ., joined. SLAUGHTER, J., filed a concurring opinion. KELLER, P.J., filed a dissenting opinion in which YEARY and KEEL, JJ., joined. YEARY, J., filed a dissenting opinion in which KELLER, P.J., and KEEL, J., joined.**

Does a driver commit a traffic offense if the car's right-rear tire briefly, but safely, touches and drives over the dividing line between the center and right lane of traffic? No. Here, a police officer stopped

Appellee for committing the traffic offense of "failing to maintain a single marked lane of traffic" when he observed the right rear tire of her rented U-Haul touch and drive on the striped line marking the right side of center lane.  No circumstances made this movement unsafe.  Appellee moved to suppress evidence obtained after that warrantless traffic stop, and the trial court granted the motion.  The court of appeals affirmed. We agree.

### The Traffic Stop

The facts in this case are not in dispute.  Corpus Christi Police Officer David Alfaro saw a U-Haul parked at a closed Kentucky Fried Chicken (KFC) restaurant at around 1:19 a.m.  He had previously received a "Be on the Lookout" (BOLO) regarding a U-Haul that was suspected of being involved in multiple burglaries. Consequently, he followed the U-Haul when it drove away from the parking lot.

While following it, Officer Alfaro observed the vehicle in the middle of a three-lane highway.  The driver, later determined to be Appellee, had control of the vehicle at that time.  The rear passenger-side tire of the truck briefly straddled the lane divider shortly after rounding a curve.  The truck moved slowly back towards the opposite lane divider while remaining in its lane.  Appellee did not veer or dash toward the other lane.  Appellee was not driving erratically.  Appellee was not

speeding. When she drifted, she did not hit anything or even come close to hitting anything. Office Alfaro then pulled Appellee over.

## The Motion to Suppress

Based upon evidence collected pursuant to a search of Appellee's vehicle after the traffic stop, the State charged Appellee with fraudulent possession of identifying information and forgery of a government instrument. Appellee filed a motion to suppress. Appellee argued that Officer Alfaro lacked reasonable suspicion to initiate the traffic stop and therefore any subsequent seizure of evidence without a warrant should be suppressed.

The State's sole witness at the hearing on Appellee's motion to suppress was Officer David Alfaro. Officer Alfaro testified to the facts recited above. Although he testified that he pulled her over for the alleged violation and to investigate what her U-Haul was doing at the KFC restaurant at that time of night, he only mentioned the alleged traffic violation as justification for the traffic stop in his arrest report.

At the hearing, defense counsel introduced footage from Officer Alfaro's dash camera into evidence. The video depicts Appellee's U-Haul traveling in the middle lane of a three-lane divided highway with no other vehicles on either side. While rounding a curve in the road to the right, her vehicle drifts towards the left side of her lane without touching

the center lane divider on the left. After rounding the curve, and as Officer Alfaro's vehicle moves closer to Appellee's vehicle, Appellee's vehicle corrects back to the right within her lane. Then, the right rear tire of Appellee's U-Haul crosses over the center lane divider on the right for "a couple seconds" and rides on top of it for a few more. Appellee's U-Haul then returns to and remains in the center lane until Officer Alfaro activates his patrol lights, and Appellee exits the highway and pulls over.

The trial court granted the motion to suppress. It supported its order granting Appellee's motion to suppress with the following findings of fact and conclusions of law:

1. The trial court finds credible the testimony of Corpus Christi Police Officer D. Alfaro that on April 23, 2017, he observed Sheila Jo Hardin's vehicle traveling on the highway in front of him in the marked center lane of travel, and that he initiated a traffic stop for failure to maintain a single lane after he observed Hardin's tires cross over the striped lines marking the center lane without Hardin signaling a lane change, although there were no other vehicles in the vicinity at the time or any other circumstance to suggest that this movement was unsafe. The trial court further finds that a video recording of Hardin's vehicle made at the time of these observations and entered into evidence at the hearing on [the] motion to suppress supports Officer Alfaro's testimony.

2. The Court further finds there was no evidence concerning the time of alleged burglaries or the BOLO regarding the U-Haul, the source of the information that a U-Haul was involved in burglaries in the area, or the reliability of the source, and there was no description of the vehicle regarding size, license plate, etc., from which an officer

> could reasonably suspect Defendant's vehicle might be involved in or have evidence of criminal activity.

The trial court concluded that, based upon these facts, Officer Alfaro lacked reasonable suspicion to stop Appellee for committing a traffic offense.

The State appealed, arguing that the trial court erred in holding Officer Alfaro lacked reasonable suspicion to stop Appellee for committing a traffic offense.  The only argument the State raised on appeal was that the failure to maintain a single lane is a traffic violation, regardless of whether or not it was safe to do so, and that violation provided reasonable suspicion for the traffic stop.[1]  The court of appeals rejected this argument and affirmed the trial court's order suppressing the evidence.

The State filed a petition for discretionary review.  We granted review to consider whether "The Thirteenth Court of Appeals erred in concluding that the officer who stopped Hardin's vehicle lacked reasonable suspicion to stop her for failing to maintain a single lane by swerving into another lane, whether or not this movement could be done safely."  We hold that the court of appeals did not err and affirm.

---

[1] *State v. Hardin*, No. 13-18-00244-CR, 2019 WL 3484428, at *4 (Tex. App.—Corpus Christi Aug. 1, 2019) (not designated for publication).

## Standard of Review

As the court of appeals correctly noted, we review a trial court's ruling on a motion to suppress under a bifurcated standard of review.[2] We give almost total deference to a trial court's determination of historical facts and credibility when supported by the record.[3] Likewise, we afford almost total deference to a trial court's ruling on mixed questions of law and fact, if the resolution to those questions turns on the evaluation of credibility and demeanor.[4] When the trial court makes explicit fact findings, as the trial court did in this case, we determine whether the evidence (viewed in the light most favorable to the trial court's ruling) supports these fact findings.[5] We review legal conclusions, such as the construction of a statute, *de novo*.[6]

## Reasonable Suspicion

A warrantless traffic stop is a Fourth Amendment seizure that is analogous to temporary detention; thus, it must be justified by

---

[2] *Hardin*, 2019 WL 3484428, at *2 (citing *Turrubiate v.* State, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013)). *See also Ford v. State*, 158 S.W.3d 488, 493 (Tex. Crim. App. 2005).

[3] *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).

[4] *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007).

[5] *State v. Kelley*, 204 S.W.3d 808, 819 (Tex. Crim. App. 2006).

[6] *Sims v. State*, 569 S.W.3d 634, 640 (Tex. Crim. App. 2019).

reasonable suspicion.[7]  If an officer has a reasonable suspicion that a person has committed a traffic violation, the officer may conduct a traffic stop.[8]  Reasonable suspicion exists if the officer has specific articulable facts that, combined with rational inferences from those facts, would lead the officer to reasonably conclude the person is, has been, or soon will be engaged in criminal activity.[9]  When making a determination of reasonable suspicion, we consider the totality of the circumstances.[10]

Here, the question of whether there was reasonable suspicion to detain Appellee is not a function of Officer Alfaro's demeanor or credibility.  Instead, it turns on the application of a traffic statute to uncontested facts.  To resolve the dispute in this case, we must first construe Transportation Code §545.060, "Driving on Roadway Laned for Traffic."  Statutory construction is a question of law that we review *de novo*.[11]

### Statutory Construction

---

[7] *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011).

[8] *Garcia v. State*, 827 S.W.3d 937, 944 (Tex. Crim. App. 1992).

[9] *Castro v. State*, 227 S.W.3d 737, 741 (Tex. Crim. App. 2007).

[10] *Curtis v. State*, 238 S.W.3d 376, 379 (Tex. Crim. App. 2007).

[11] *Mahaffey v. State*, 316 S.W.3d 633, 637 (Tex. Crim. App. 2010).

When we interpret statues, we seek to effectuate the collective intent or purpose of the legislators who enacted the legislation.[12]  In doing so, we necessarily focus our attention on the literal text of the statute in question and attempt to discern the fair, objective meaning of the text at the time of its enactment.[13]  We follow this principle because (1) the text of the statute is the law; (2) the text is the only definitive evidence of what the legislators had in mind when the statute was enacted into law; and (3) the Legislature is constitutionally entitled to expect that the Judiciary will faithfully follow the specific text that was adopted.[14]  Our duty is to try to interpret the work of our Legislature as best we can to fully effectuate the goals they set out.[15]  Legislative intent isn't the law, but discerning legislative intent isn't the end goal, either.[16]  The end goal is interpreting the text of the statute.[17]

In interpreting the text of the statute, we must presume that every word in a statute has been used for a purpose and that each word,

---

[12] *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991).

[13] *Watkins v. State*, 619 S.W.3d 265, 271–72 (Tex. Crim. App. 2021) (citing *Boykin*, 818 S.W.2d at 785).

[14] *Mahaffey*, 316 S.W.3d at 637–38 (quoting *Boykin*, 818 S.W.2d at 785).

[15] *Watkins*, 619 S.W.3d at 272.

[16] *Id*.

[17] *See State v. Mancuso*, 919 S.W.2d 86, 87 (Tex. Crim. App. 1996) (citing *Boykin*, 818 S.W.2d at 785 and Tex. Const. art. II, § 1 for the proposition that "[i]t is the duty of the Legislature to make laws, and it is the function of the Judiciary to interpret those laws.").

phrase, clause, and sentence should be given effect if reasonably possible.[18] We do not focus solely upon a discrete provision; we look at other statutory provisions as well to harmonize text and avoid conflicts.[19] "Time-honored canons of interpretation, both semantic and contextual, can aid interpretation, provided the canons esteem textual interpretation."[20]

Moreover, we read words and phrases in context and construe them according to rules of grammar.[21] When a particular term is not legislatively defined but has acquired a technical meaning, we construe that term in its technical sense.[22] When it has not, we construe that term according to common usage.[23] We may consult standard or legal dictionaries to determine the meaning of undefined terms.[24]

---

[18] *State v. Rosenbaum*, 818 S.W.2d 398, 400–01 (Tex. Crim. App. 1991) (citing TEX. GOV'T. CODE §§ 311.025(b), 311.026(a); *State v. Hardy*, 963 S.W.2d 516, 520 (Tex. Crim. App. 1997)); *Morter v. State*, 551 S.W.2d 715, 718 (Tex. Crim. App. 1977) ("Every word of a statute is presumed to have been used for a purpose, and a cardinal rule of statutory construction requires that each sentence, clause, phrase and word be given effect if reasonably possible.") (quoting *Eddins-Walcher Butane Co. v. Calvert*, 298 S.W.2d 93, 96 (Tex. 1957)).

[19] *Watkins*, 619 S.W.3d at 272.

[20] *BankDirect Capital Fin., LLC v. Plasma Fab, LLC*, 519 S.W.3d 76, 84 (Tex. 2017).

[21] *Yazdchi v. State*, 428 S.W.3d 831, 837 (Tex. Crim. App. 2014).

[22] *Watkins*, 619 S.W.3d at 272.

[23] *Id.*

[24] *Clinton v. State*, 354 S.W.3d 795, 800 (Tex. Crim. App. 2001); *Ex parte Rieck*, 144 S.W.3d 510, 512–13 (Tex. Crim. App. 2004).

## Transportation Code § 545.060 and
## Failure to Maintain a Single Lane

At the heart of this case is the construction of the statute that gives rise to the offense colloquially referred to as "failure to maintain a single lane." Texas Transportation Code Section 545.060(a), titled "Driving on Roadway Laned for Traffic," gives rise to this traffic offense. Section 545.060(a) provides in relevant part:

> (a) An operator on a roadway divided into two or more clearly marked lanes for traffic:
>
> > (1) shall drive as nearly as practical entirely within a single lane; and
>
> > (2) may not move from the lane unless that movement can be made safely.[25]

Considering the statute as a whole, the statute is clear and unambiguous. "Nearly" means "almost but not quite."[26] "Practical" as it is used in the statute simply means "having or displaying good judgment: SENSIBLE."[27] "Safely" means "free from harm or risk," "secure from threat of danger, harm, or loss," or "affording safety or

---

[25] TEX. TRANSP. CODE § 545.060(a).

[26] Merriam-Webster's Collegiate Dictionary 828 (11th ed. 2020).

[27] *See* Webster's II: New College Dictionary at 867 (1999); *see also* Black's Law Dictionary 1418 (11th ed. 2019) (including the definition of "likely to succeed or be effective" as one possible definition of "practical."); *see also* The Brittanica Dictionary (2022), https://www.britannica.com/dictionary/practical (including the following possible definitions: "likely to succeed and reasonable to do or use"; "relating to what can or should be done in an actual situation"; "logical and reasonable in a particular situation").

security from danger, risk, or difficulty."[28]  No one disputes that we should adopt the common understanding of these applicable terms.  The dispute, instead, centers around whether the two statutory subsections create two different offenses or one.

A plain reading of the statute reveals that a motorist does not commit an offense any time a tire touches or crosses a clearly marked lane.  It is only when the failure to stay "as nearly as practical" entirely with a single lane becomes unsafe that a motorist violates the statute.  Subsection (a)(1) does not require a motorist to stay entirely within a single lane; it only requires that a motorist remain entirely within a single marked lane "as nearly as practical."  In other words, a motorist is not actually required to maintain a single marked lane under subsection (a)(1).  He or she must "almost, but not quite" stay within the lane.  This section is designed to protect motorists from being accused of a crime due to an inability to stay entirely within a single marked lane at all times.

---

[28] Merriam-Websters Collegiate Dictionary 1095 (11th ed. 2020); *see also* Cambridge Dictionary (2022), https://dictionary.cambridge.org/us/dictionary/english/safely (defining "safely" as meaning "in a safe way; without experiencing or causing danger or harm"); Macmillan Dictionary (2022), https://www.macmillandictionary.com/us/dictionary/american/safely (defining "safely" to mean "in a way that is not likely to cause damage, injury, or harm" and "in a way that does not involve a lot of risk"); Collins Dictionary (2022), https://www.collinsdictionary.com/us/dictionary/english/safely ("If something is done safely, it is done in a way that makes it unlikely that anyone will be harmed.").

Subsection (a)(2), on the other hand, prohibits any movement from the lane unless that movement can be made safely. And while the phrase "move from the lane" can include a complete lane change, the scope of the statute is not textually limited to situations in which the driver moves "entirely" from the lane because the legislature did not modify the word "move" with the word "entirely." Considered in connection with subsection (a)(1), any unsafe weaving out of the lane violates the statute but weaving out of the lane without creating a safety risk does not violate the statute because incidental weaving is still staying "as nearly as practical" entirely within the single lane.

Our legislature evinced an intent that these two subsections be read together because they are joined in two ways. First, the legislature's use of the word "and" in the statute suggests that a driver must both drive in a single marked lane as nearly as practical and not move from that lane unless it can be done safely.[29] The use of the word "and" between two words or phrases most commonly means that the words or phrases on either side of the "and" are required.[30] For example, in the well-known constitutional phrase "cruel and unusual

---

[29] *See* Antonin Scalia & Bryan A. Garner, Reading Law 116 (2012) ("Under the conjunctive/disjunctive canon, and combines items while or creates alternatives.").

[30] *Id.*

punishment" the word "and" signals that a particular punishment must meet both standards to fall within the constitutional prohibition.[31]

Second, subsection (a)(1) refers to "a single lane" while subsection (a)(2) refers to "the lane."  Combined with the legislature's use of the conjunction "and" this reference to "the lane" in subsection (a)(2) is clearly intended as a reference to the "single lane" described in subsection (a)(1).  In this way, subsection (a)(2) clarifies that the legislature envisions a driver driving within the single lane in subsection (a)(1) and potentially committing an offense when unsafely moving outside of it.  Accordingly, incidental movement outside a single lane will not run afoul of the statute, but unsafe movement will.

This is the only construction of the statute that gives effect to both statutory subsections.  Even though one subsection arguably refers to a required act and the other refers to a prohibited act, both subsections are necessarily focused on the same conduct—moving out of the same single lane.  In this way, both (a)(1) and (a)(2) are dependent upon each other.  The phrase "as nearly as practical" is given effect by providing the circumstances in which a motorist does not commit an offense even if he or she fails to stay entirely within a single lane. Invariably the determination of when movement outside of a single lane

---

[31] *Id.*

can be characterized as no longer staying "almost, but not quite" entirely within a single lane requires resort to facts that suggest the continued movement outside the single lane is not safe.  And that is how the safety requirement in (a)(2) is given effect because it provides a way of evaluating when a motorist's inability to stay within the lane goes beyond incidental movements outside the lane and rises to the level of a traffic offense.  Reading the statute as two separate requirements overlooks the interconnectedness of each subsection.

Conversely, reading the statutory subsections as two independent requirements would render subsection (a)(1) unconstitutionally vague. Generally, a penal statute must define a criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary or discriminatory enforcement.[32]  Had the statute created a duty to stay entirely within a single lane, we might draw a different conclusion.  But (a)(1) creates a duty to stay "as nearly as practical" entirely within a single lane.  Even assuming a motorist has notice of when he or she is no longer being "practical," it is impossible for a motorist to know what constitutes "almost, but not quite" practical for purposes of avoiding criminal liability.  In this manner, subsection (a)(1), when read alone,

---

[32] *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).

not only fails to tell ordinary citizens how they are supposed to drive, it also encourages arbitrary enforcement by leaving the question of when someone fails to drive "as nearly as practical" within a single lane entirely up to the arresting officer.

Further, reading the subsections independently of each other would render subsection (a)(2) meaningless. Recognizing an offense for any movement from a single marked lane that is something more significant than driving "as nearly as practical" within a single lane but nevertheless safe would necessarily subsume any offense based upon an "unsafe" movement from that lane. There would be no reason to ever evaluate whether movement from the lane was "safe" if the only necessary showing is whether the movement was no longer "as nearly as practical."

Finally, this reading of the statute would create a conflict with Transportation Code § 545.103, which prohibits a driver from moving right or left on a roadway unless that movement can be made safely.[33] Reading the two statutory subsections as interconnected and dependent

---

[33] *See* TEX. TRANSP. CODE § 545.103 ("An operator may not turn the vehicle to enter a private road or driveway, otherwise turn the vehicle from a direct course, or move right or left on a roadway unless movement can be made safely."). Nothing in the text of this statute limits its application to unmarked roadways. To the contrary, the Transportation Code defines "laned roadway" as a type of "roadway." TEX. TRANSP. CODE §541.302. And the Legislature's use of the broader term "roadway" in §545.103 evinces an intent that the statute apply to roadways with or without lanes.

on each other is the only way to give effect to not only the statute at issue but also the statue's place within the legislative scheme. Consequently, we hold that a person only violates Transportation Code § 545.060(a) if the person fails to maintain a single marked lane of traffic in an unsafe manner.

In this case, we are only concerned with whether there was reasonable suspicion for Officer Alfaro to stop Appellee for violating § 545.060(a). The trial court found that Appellee's tires crossed over the striped lines marking the center lane without Appellee signaling a lane change. This finding is supported by the record, including a video of Appellee's driving before the stop, which shows the right rear wheel of Appellee's U-Haul driving on and slightly over the lane divider for a few seconds. But the trial court also found that there were no other vehicles in the vicinity at the time or any other circumstances that would suggest that Appellee's movement was unsafe. This finding is also supported by the record, and the State does not challenge it on appeal. Given these findings, we agree with the court of appeals that the trial court did not err in granting Appellee's motion to suppress because without any evidence suggesting that this movement was unsafe, Officer Alfaro lacked reasonable suspicion to stop her vehicle.[34] At most, the record

---

[34] As noted below by the court of appeals, the State does not argue that the BOLO warning provided Officer Alfaro with reasonable suspicion to stop Hardin. *State v. Hardin*, 2019 WL

shows that Appellee drove "as nearly as practical" entirely within a single lane, which is not a traffic violation.

The State urges us to adopt the position taken by four judges of this Court in *Leming v. State*.[35] Under that position, the "offense" for failure to maintain a single lane is found in § 542.301 of the Transportation Code, not in § 545.060, which nevertheless sets out the elements of the offense. Section 542.301 states that a person commits an offense "if the person performs an act prohibited or fails to perform an act required" by the applicable subtitle of the Transportation Code.[36] Under this argument, the failure to maintain a single lane constitutes an offense because it amounts to the failure to perform an act required by the Transportation Code, and the movement from a lane in an unsafe manner also constitutes an independent offense because it amounts to the performance of a prohibited act. We disagree.

---

3484428 at *2 (Tex. App.—Corpus Christi 2019). The only issue raised by the State on discretionary review is whether Officer Alfaro had reasonable suspicion to stop Appellee based upon her failure to maintain a single lane.

[35] 493 S.W.3d 552, 561 (Tex. Crim. App. 2016). It is tempting to consider this position a "plurality" of the Court, but that is not an accurate designation. As we have explained, a "plurality opinion" is an opinion in a fractured decision that was joined by the highest number of judges or justices. *Unkart v. State*, 400 S.W.3d 94, 100 (Tex. Crim. App. 2013). But the portion of the opinion in *Leming* giving rise to the State's argument was not adopted by a plurality of the Court, as four judges on the Court disagreed with that analysis. *See Leming*, 493 S.W.3d at 568 (Keasler, J. dissenting); *see also Leming*, 493 S.W.3d at 573 (Newell, J. dissenting) ("I join Judge Keasler's dissenting opinion on the issue of the statutory construction of Section 545.060(a) of the Transportation Code because I, too, do not read "and" to mean "or."). On this issue, *Leming* resulted in a tie with neither of the two opposing viewpoints gaining a plurality.

[36] TEX. TRANSP. CODE § 542.301.

This interpretation of the statute assumes what it seeks to prove. The general offense provision found in § 542.301 speaks to the general requirement that all violations of the Transportation Code must involve either an act or a failure to act. It does not set out the elements of any specific offense. Nor does it clarify how to construe a statute that characterizes the same conduct as both the failure to perform a required act and the performance of a prohibited act. For example, § 545.066 of the Transportation Code describes two separate acts, stopping before reaching a school bus when the bus is operating a visual signal and starting again before one of three events occurs, namely the bus resumes motion, the bus driver signals the operator to proceed, or the visual sign is no longer actuated.[37] The State's reading of § 542.301 can apply easily to that statute because it deals with two separate acts.[38] But § 545.060 only deals with one act—moving out of a single marked lane—even though the statute characterizes that conduct as both an act and a failure to act. The general offense provision found in § 542.301 does not speak to that type of situation.

---

[37] TEX. TRANSP. CODE § 545.066.

[38] This statute is similar to Transportation Code § 545.053, which deals with passing a vehicle on the left and the moving back to the right safely. TEX. TRANSP. CODE § 545.053. Both § 545.066 and § 545.053 deal with offenses that, by their own terms, cover two separate acts.

Given this context, § 542.301 is best understood as a general provision recognizing that violating a traffic regulation amounts to a criminal offense regardless of whether the violation flows from an act or a failure to act. That section does not suggest how to determine whether a particular Transportation Code section sets out a single offense, multiple different ways of committing the same offense, or multiple different offenses. Determining those issues requires examination of the specific statutes that actually require or proscribe conduct.

Moreover, this interpretation fails to account for the history of the statute. The original statutory provision, Article 6701d, §60, was enacted in 1947 as part Senate Bill 172, a comprehensive set of statutes regulating traffic.[39] The text of Article 6701d, §60 was originally drafted as a single sentence:

> **Sec. 60.** Whenever any roadway has been divided into two (2) or more clearly marked lanes for traffic the following rules in addition to all others consistent herewith shall apply:
>
> > (a) The driver of a vehicle shall drive as nearly as practical entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such a movement can be made safely.[40]

---

[39] *See* Act of June 3, 1947, 50th Leg., R.S., ch. 421, § 60, 1947 Tex. Gen. Laws 967, 978, *repealed by* Act of April 21, 1995, 74th Leg., R.S., ch. 165, § 24(a), 1995 Tex. Gen. Laws 1025, 1870.

[40] TEX. REV. CIV. STAT. Article 6701d, § 60(a) (Vernon 1977).

In 1995, the Legislature repealed the Revised Civil Statutes dealing with Traffic Regulations and replaced it with the Transportation Code.[41] The Transportation Code was enacted as part of the state's continuing statutory revision program, which codified the previous statutes without substantive change.[42] So, even though the statute was later broken up into two different subsections, the Legislature specifically declared its intent that this change was cosmetic and not substantive. Even if we were to assume that the statute was ambiguous, the statutory history suggests that the Legislature has always intended that this subsection create only one offense.

Finally, we reject the suggestion that a motorist who drives between two lanes for an extended period of time could never be subject to a traffic stop. Each case involving the review of traffic stop depends upon the unique circumstances of that offense, so it is inappropriate to suggest how this Court would apply this statute to another and obviously incomplete set of facts. But even assuming that this hypothetical behavior does not violate § 545.060, it may provide specific articulable facts to support reasonable suspicion for violation of another offense.

---

[41] *See* Act of April 21, 1995, 74th Leg., R.S., ch. 165, § 1, 1995 Tex. Gen. Laws 1025, 1025.

[42] TEX. TRANSP. CODE § 1.001.

Indeed, we held in *Leming* that the officer in that case had reasonable suspicion to stop the defendant for driving while intoxicated regardless of whether he failed to maintain a single lane.[43]  Notably, the defendant in *Leming* was seen driving slowly and swerving radically within his own lane.  He also crossed the center stripe of the road moving partially into another lane of traffic.  However, the officers testified that they did not stop the defendant immediately because it would have created a safety concern.  We held under those circumstances that these facts gave rise to reasonable suspicion for the offense of DWI.[44]  Thus, even under circumstances in which a motorist crosses from one lane into another without necessarily raising a safety concern, that behavior can still be considered along with other facts to provide reasonable suspicion to stop for suspicion of driving while intoxicated.  Our interpretation of § 545.060 in this case should not be misconstrued or overread to suggest that a traffic stop is always unreasonable in every instance in which a driver weaves in and out of a single lane.[45]

---

[43] *Leming*, 493 S.W.3d at 563-64.

[44] *Id.* at 565.

[45] In her concurring opinion, Judge Slaughter observes that Officer Alfaro's stop could have been justified under a theory that he acted under a reasonable mistake regarding unsettled law.  At least one court of appeals has reached a similar conclusion post-*Leming*.  *See, e.g., Dugar v. State*, 629 S.W.3d 494, 499 (Tex. App.—Beaumont 2021, pet. ref'd.).  We take no issue with that holding.  However, as the concurring opinion correctly observes, the State

## Conclusion

Based on our review of the record and our precedent, we conclude that the detaining officer did not have reasonable suspicion to stop Appellee for violating Transportation Code Section 545.060. Accordingly, the trial court did not err in granting Appellee's motion to suppress. We affirm the decision of the court of appeals.

FILED: November 2, 2022

PUBLISH

---

chose not to make that argument in this case. Therefore, we cannot reverse the trial court's holding on that theory. *State v. Mercado*, 972 S.W.2d 75, 78 (Tex. Crim. App. 1998).